UNITED STATES, Appellant,

v.

Keith W. BARNES, a.k.a. Ricky O. Barnes, Appellee.

No. 84–1433.

District of Columbia Court of Appeals.
Argued March 28, 1985.
Decided Aug. 16, 1985.

Bradley L. Kelly, Asst. U.S. Atty., Washington, D.C., with whom Joseph E. diGenova, U.S. Atty. and Michael W. Farrell and Zinora M. Mitchell, Asst. U.S. Attys., Washington, D.C., were on the brief, for appellant.

James G. McGuire, Washington, D.C., for appellee.

Before PRYOR, Chief Judge, and FERREN and BELSON, Associate Judges.

FERREN, Associate Judge:

In this appeal, the United States challenges the trial court's order granting appellee's motion to suppress a pistol and ammunition seized from his person and used as the basis of the weapons charges against him. Because we conclude that the circumstances justified a *Terry*[1] stop and frisk, we reverse and remand for trial.

## I.

On March 29, 1984, at about 10:00 p.m., Officers Robert Clark and Michael Turner were sitting in a marked police car parked on the 1000 block of 14th Street, N.W. Officer Clark had patrolled that location before and regarded it as a "high crime area." He observed appellee standing in front of a men's clothing store. Appellee was looking up and down the street while a companion went in and out of the store two or three times, exchanging words with appellee as he entered and exited. Officer Clark observed this behavior for five or ten minutes and found it "suspicious" because appellee's companion appeared to be "cas[ing]" the inside of the store before closing time while appellee was acting as a lookout.[2]

Officer Clark approached appellee and asked him to remove his hands from his pockets. Clark then inquired what appellee was doing there. He replied that he was "[b]asically just hanging around, had no business," and was "[j]ust basically wasting time." Clark asked appellee if he had ever been arrested; he replied that he had been arrested for armed robbery. Officer Clark testified that he then observed a bulge in the stomach area of appellee's windbreaker which "looked unusual."[3] Clark touched the bulge and thought it felt like a gun. Clark asked appellee to put his hands on the police car and then removed a revolver from appellee's jacket. Clark arrested appellee and advised him of his rights.

After hearing testimony from the two officers and from appellee, the court concluded that the facts did not "justify a suspicion sufficient to stop [appellee] and to conduct a search." The court then granted the motion to suppress.[4]

## II.

In every *Terry* controversy, the central question is whether the circumstances,

1. *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968).

2. Clark testified that he believed the store was about to close for the night; the government introduced no independent evidence on the point.

3. Officer Turner confirmed Officer Clark's version. Turner testified that appellee was wearing two jackets, but that the outer jacket was "unzipped" and the front of the windbreaker was "fully exposed." To the contrary, appellee testified that the police could not have observed the bulge in his windbreaker because he was wearing a heavy down jacket zipped up over the windbreaker. After observing a demonstration of appellee with the pistol in the pouch of his windbreaker and the down jacket in both positions, the court stated that the bulge was observable with the jacket unzipped but not with it zipped. The court, however, made no finding as to whether the jacket was zipped or not at the time of the stop.

4. It is not clear whether the trial court suppressed the pistol and ammunition because it concluded that the officer's approach and questioning constituted a seizure, unwarranted by "some minimal level of objective justification," *Immigration and Naturalization Serv. v. Delgado,* 466 U.S. 210, 104 S.Ct. 1758, 1763, 80 L.Ed.2d 247 (1984), with the result that the question whether the officers saw the bulge in the stomach area of appellee's jacket was irrelevant, *see supra* note 3; or whether the trial court instead concluded that appellee's conduct *and* answers to police questions did not provide an "objective justification" for a seizure and frisk, and that the alleged bulge in appellee's windbreaker was not established because the court believed appellee's testimony that the down jacket was zipped up over the windbreaker, not the officers' testimony to the contrary.

at the time of the seizure,[5] were such that the police officer reasonably could conclude, in light of his or her experience, that there was impending criminal activity. *Terry v. Ohio*, 392 U.S. 1, 29–30, 88 S.Ct. 1868, 1884, 20 L.Ed.2d 889 (1968). Accordingly, there must be "some particularized and objective justification" for the seizure. *United States v. Mendenhall*, 446 U.S. 544, 554, 100 S.Ct. 1870, 1877, 64 L.Ed.2d 497 (1980) (plurality opinion).

▮ In resolving the propriety of a seizure, the court often confronts a threshold question of considerable legal significance—When did the seizure occur?—for "not all personal intercourse between policemen and citizens involves 'seizures' of persons." 392 U.S. at 19 n. 16, 88 S.Ct. at 1878 n. 16. Suppose, for example, that a police officer approaches someone on the street and, through questioning, elicits answers which, when added to other circumstances, would justify a *Terry* seizure and related frisk that could not constitutionally be justified by the other circumstances alone. If the approach and questioning produced merely a "consensual encounter," *Immigration and Naturalization Service*

*v. Delgado*, 466 U.S. 210, 104 S.Ct. 1758, 1762, 80 L.Ed.2d 247 (1984), the eventual seizure and frisk, premised in part on the answers to police questions, would be lawful. But if the approach and questioning amounted to a seizure—*i.e.*, physical force or a show of authority such that a reasonable person would not believe he was free to leave—that seizure would be unconstitutional, and thus the later, more formal detention and related frisk would be as well.

### A.

In this case, the government argues—citing the facts in *Terry* itself—that the conduct of appellee and his companion in front of the clothing store presented a sufficiently objective basis for a *Terry* seizure before Officer Clark left his car to approach appellee; thus, says the government, we do not need to evaluate whether the seizure occurred before or after Clark asked questions. We disagree.[6] We are satisfied that before Officer Clark asked appellee to take his hands out of his pockets and to answer two questions—"What are you doing here?" and "Have you ever been arrest-

---

5. In *Terry*, the Court defined "seizure" as follows: "Only when the officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen may we conclude that a 'seizure' has occurred." 392 U.S. at 19 n. 16, 88 S.Ct. at 1878 n. 16. Later, a plurality of the Court defined what it meant by a restraint on liberty: "a person has been 'seized' within the meaning of the Fourth Amendment only if, in view of all of the circumstances surrounding the incident, a reasonable person would have believed he was not free to leave." *United States v. Mendenhall*, 446 U.S. 544, 554, 100 S.Ct. 1870, 1877, 64 L.Ed.2d 497 (1980) (plurality opinion) (footnote omitted).

6. In *Terry*, a police detective one afternoon was patrolling an area of downtown Cleveland, where he had been assigned for 30 years, looking out for shoplifters and pickpockets. 392 U.S. at 5, 88 S.Ct. at 1871. He saw a man walk back and forth past a store window, look in, and then join and confer with another man on a street corner. *Id.* at 6, 88 S.Ct. at 1872. This second man repeated the pattern. *Id.* Altogether, the men carried out this ritual approximately 12 times. *Id.* At one point, a third man joined them on the corner and then left. *Id.* Soon thereafter, the two men left following the same

route the third man had taken. *Id.* After observing this behavior for 10 to 12 minutes, the detective had become "thoroughly suspicious," *id.* at 6, 88 S.Ct. at 1872, and suspected the men of "casing a job, a stick-up." *Id.* The detective accordingly pursued the men, found all three in front of another store, and asked for their names. *Id.* at 6–7, 88 S.Ct. at 1872. When the men mumbled responses, the detective grabbed Terry and, placing Terry as a shield between himself and the others, frisked Terry and felt a gun. *Id.* at 7, 88 S.Ct. at 1872. The detective then ordered the three men into a nearby store, removed Terry's coat in order to seize the gun, and frisked the others, going beneath the outer clothing only if he felt a gun. *Id.* The Court sustained the stop and frisk, *id.* at 28, 88 S.Ct. at 1883, announcing the landmark decision underlying this appeal.

The suspects' activity in *Terry* was much less capable of an alternative, innocent explanation than the conduct of appellee and his companion in this case. In any event, the detective did not seize Terry before asking for identification—a question, as in this case, that might have led to an innocent explanation.

ed?"—there was no "particularized and objective justification," *Mendenhall,* 446 U.S. at 554, 100 S.Ct. at 1877, for a *Terry* seizure.

■ Appellee's standing in front of a store just before it closed, looking up and down the street while a companion went in and out a few times and conferred with appellee on each occasion, is not sufficiently suspicious—even in a "high crime" area—to warrant an investigative seizure of the person. Such behavior, while somewhat suspicious, is capable of too many innocent explanations to justify such an intrusion; for example, the two men could have been waiting impatiently for an employee friend to get off work, or they may have been manifesting a frustrated ambivalence about whether to make a particular purchase. *See Brown v. Texas,* 443 U.S. 47, 51–52, 99 S.Ct. 2637, 2640–2641, 61 L.Ed.2d 357 (1979) (no justification for seizing appellant seen walking away from another man in alley in area known for drug traffic); *Robinson v. United States,* 278 A.2d 458, 459 (D.C.1971) (no basis for seizing appellant observed walking with another man down street at 2:00 a.m. and then standing with him in an apartment garage). *Cf. United States v. Johnson,* 496 A.2d 592, 594, 595 (D.C.1985) (persons parked in car late at night in high crime area do not, "'without more, present specific, articulable facts warranting suspicion of criminal activity'") (citation omitted). Accordingly, if the officer's approach and questioning constituted a seizure, it was unconstitutional, and the pistol and ammunition recovered from the ensuing frisk would have to be suppressed. *See Robinson,* 278 A.2d at 459.

**B.**

■ We therefore squarely confront the question whether Officer Clark's approach and questioning produced a "consensual encounter," *Delgado,* 104 S.Ct. at 1762, or a seizure. Recently, in *Florida v. Royer,* 460 U.S. 491, 497, 103 S.Ct. 1319, 1324, 75 L.Ed.2d 229 (1983) (citations omitted), the Supreme Court stated:

> [L]aw enforcement officers do not violate the Fourth Amendment by merely approaching an individual on the street or in another public place, by asking him if he is willing to answer some questions, by putting questions to him if the person is willing to listen, or by offering in evidence in a criminal prosecution his voluntary answers to such questions.... Nor would the fact that the officer identifies himself as a police officer, without more, convert the encounter into a seizure requiring some level of objective justification.[7]

On the other hand, in *Mendenhall,* 446 U.S. at 554, 100 S.Ct. at 1877, the Court had given "[e]xamples of circumstances that might indicate a seizure, even where the person did not attempt to leave":

> the threatening presence of several officers, the display of a weapon by an officer, some physical touching of the person of the citizen, or the use of language or tone of voice indicating that compliance with the officer's request might be compelled.[8]

Putting *Royer, Mendenhall,* and other cases together, the Court last year in *Delgado,* 104 S.Ct. at 1762–63, summarized the current state of the law:

> Although we have yet to rule directly on whether mere questioning of an indi-

---

7. *See, e.g., Purce v. United States,* 482 A.2d 772, 772 (D.C.1984) (no seizure when police officer saw suspect asleep or unconscious in car, tapped on window, awakened suspect, and asked for identification); *United States v. Burrell,* 286 A.2d 845, 846–47 (D.C.1972) (no seizure when police officer touched suspect on arm and said, "Hold it, sir, could I speak with you a second?").

8. *See, e.g., Johnson,* at 594, 595 (uniformed officer's command to "'come here, police officer'" was a Fourth Amendment seizure); *Crowder v. United States,* 379 A.2d 1183, 1185 (D.C. 1977) (per curiam) (seizure when three officers alighted from two squad cars near suspect and demanded identification).

vidual by a police official, without more, can amount to a seizure under the Fourth Amendment ... [it] is apparent ... that police questioning, by itself, is unlikely to result in a Fourth Amendment violation. While most citizens will respond to a police request, the fact that people do so, and do so without being told they are free not to respond, hardly eliminates the consensual nature of the response. [Citation omitted.] Unless the circumstances of the encounter are so intimidating as to demonstrate that a reasonable person would have believed he was not free to leave if he had not responded, one cannot say that the questioning resulted in a detention under the Fourth Amendment.

The Court has made clear, moreover, that the police also may ask a person to do something, such as produce identification or an airline ticket, *see Royer* and *Mendenhall*, without necessarily converting the encounter into a seizure.

Thus, for *Terry* purposes, the Court has virtually deemed a police approach for questioning on the street to trigger a "consensual encounter," *Delgado*, 104 S.Ct. at 1762, absent "intimidating" circumstances beyond the natural sense of obligation almost anyone would feel when a police officer begins asking questions.[9]

Although the Court has not said so, there may be a practical policy reason why it has gone so far to find consensual encounters, not seizures, when the police question persons on the street. As in this case, the conduct of appellee and his companion, while consistent with innocent explanations, was also consistent with potential criminal activity. Thus, "[i]t would have been poor police work" for Officer Clark, who was "experience[d] in the detection of thievery from stores in this same neighborhood to have failed to investigate this behavior further." *Terry*, 392 U.S. at 23, 88 S.Ct. at 1881. On the other hand, the Court has characterized the Fourth Amendment guarantee against unreasonable searches and seizures as an "inestimable right of personal security." *Id.* at 8–9, 88 S.Ct. at 1873. In the years since *Terry*, therefore, the Court in case after case of a street encounter has had to resolve the "tensions involved," *id.* at 10, 88 S.Ct. at 1874, in protecting both the public's interest in safety and the individual's right of personal security.

It would appear that, in these cases, the Court increasingly has opted in the favor of public safety. It has done so by electing to raise the threshold of what is meant by a "seizure," rather than by deciding to lower the standard for the "minimal level of objective justification [required] to validate the detention or seizure." *Delgado*, 104 S.Ct. at 1763. In sum, in the interest of permitting the police to do their job, consistent with individual rights, the Court apparently has found it preferable to deem nonintimidating police questioning a "consensual encounter," not a seizure, rather

---

9. The Court's test for a seizure—whether one reasonably would have believed he or she was not free to leave—can be called an arbitrary formulation; it is difficult to imagine that many persons confronted by a police officer would feel free to ignore questions and walk away, without being told of the right to do so. *But see Brown*, 443 U.S. at 48–49, 99 S.Ct. at 2639–2640; *Robinson*, 278 A.2d at 459. Interestingly, if a person approached by a police officer for pre-seizure questioning uncharacteristically rebuffs the officer by refusing to answer and calmly walking away—thus precluding a "consensual encounter"—the police may not detain him absent other circumstances that would warrant a seizure. *Brown*, 443 U.S. at 52, 99 S.Ct. at 2641 (reversed conviction under criminal statute requiring anyone lawfully stopped by police to give name and address; police—absent reasonable suspicion of misconduct—violated Fourth Amendment by physically detaining suspect to determine identity after he had refused to identify himself); *Robinson*, 278 A.2d at 459 (heroin suppressed when, absent reasonable suspicion of misconduct, police patted down suspect and seized pouch from hand after he had refused officer's request to wait). In sum, "if the persons refuse to answer and the police take additional steps—such as those taken in *Brown*—to obtain an answer, then the Fourth Amendment imposes some minimal level of objective justification to validate the detention or seizure." *Delgado*, 104 S.Ct. at 1763.

than to risk justifying seizures based on marginally suspicious circumstances which are capable of innocent explanation.

In the case before us, Officer Clark's request that appellee remove his hands from his pockets (which was no more intrusive than a request for identification), followed by two questions and appellee's "voluntary answers," *Royer*, 460 U.S. at 497, 103 S.Ct. at 1324, met the Supreme Court test for a pre-seizure, "consensual encounter." There are no indications of "intimidating" circumstances, such as those listed in *Mendenhall.* Officer Turner remained in the car while Officer Clark alone approached appellee. Clark did not touch appellee or draw a gun. Clark's requests that appellee remove his hands from his pockets and answer two questions were nonintimidating; there was no threatening language or any indication that Clark used a severe tone of voice. In short, nothing happened—under Supreme Court analysis—that would have warranted appellee's reasonable belief that he was not free to ignore the questions and walk away. *See Purce v. United States*, 482 A.2d 772, 775–77 (D.C.1984); *Harris v. United States*, 382 A.2d 1016, 1019 (D.C.1978); *United States v. Castellanos*, 235 U.S.App.D.C. 277, 281, 731 F.2d 979, 983 (1984); *United States v. Wylie*, 186 U.S.App.D.C. 231, 236–37, 569 F.2d 62, 67–68 (1977), *cert. denied*, 435 U.S. 944, 98 S.Ct. 1527, 55 L.Ed.2d 542 (1978). Accordingly, Officer Clark was entitled to consider appellee's answers in determining whether there was a reasonable suspicion of impending criminal activity warranting a seizure and protective frisk.

### III.

■ We now consider the facts from Officer Clark's viewpoint immediately before the simultaneous seizure and frisk. Over a five to ten minute period he had seen appellee in front of a clothing store in a high-crime area, apparently near closing time late at night; appellee's companion went in and out of the store two or three times while appellee looked up and down the street; appellee and his companion conferred each time the companion came out of the store; appellee answered the officer's first question by saying he was "[b]asically just hanging around, had no business," and was "[j]ust basically wasting time"; and appellee then responded, to a second question, that he previously had been arrested for armed robbery.

Appellee's conduct with his companion was consistent with planning a theft, and Officer Clark's suspicion was reinforced by appellee's admissions that he "had no business" at the store and had previously been arrested for armed robbery. These answers undermined the likelihood of an innocent explanation for the observed conduct. Under these circumstances, especially because appellee virtually confirmed he once had been armed, *Terry* justified an investigatory detention and protective frisk. "[W]here a police officer observes unusual conduct which leads him reasonably to conclude in light of his experience that criminal activity may be afoot and that the persons with whom he is dealing may be armed and presently dangerous," *Terry*, 392 U.S. at 30, 88 S.Ct. at 1884, the officer may, "for the protection of himself and others," *id.*, conduct an investigatory stop and frisk "reasonably related in scope to the justification for their initiation." *Id.* at 29, 88 S.Ct. at 1884. Accordingly, whether or not the officer observed a bulge (possibly indicating a gun) in the stomach area of appellee's windbreaker, *see supra* note 3, he was entitled to detain appellee and pat down his clothing for protective purposes—an intrusion reasonably "confined in scope" to discover a concealed weapon, *Terry*, 392 U.S. at 29, 88 S.Ct. at 1884—and to remove the revolver he discovered as a result.

*Reversed and remanded.*

PRYOR, Chief Judge, concurring:

When viewed from the vantage point of a reasonable law enforcement officer, *Peterkin v. United States*, 281 A.2d 567, 568 (D.C.1971), the initial encounter in this case, whether consensual or not, was sup-

ported by sufficient articulable suspicion to justify the officer's questioning, which, in turn, escalated to a frisk. While the officer would not have been justified in frisking appellant initially, his subsequent response, based on evolving facts, was consistent with *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968).

Without accepting all that the majority opinion entails, I would reverse the suppression order.