**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 17-1901
_____

UNITED STATES OF AMERICA

v.

AMIN DE CASTRO,
                        Appellant
_____

On Appeal from the United States District Court
for the Eastern District of Pennsylvania
(D.C. Crim. No. 2-15-cr-00114-001)
District Judge: Honorable Juan R. Sanchez
_____

Argued April 9, 2018
_____

Before:  CHAGARES, VANASKIE, and FISHER, *Circuit Judges*

(Opinion Filed:  October 3, 2018)

Jacob Schuman, Esq. [ARGUED]
Robert Epstein, Esq.

Maranna J. Meehan, Esq.
Federal Community Defender Office for the
Eastern District of Pennsylvania
601 Walnut Street
The Curtis Center, Suite 540 West
Philadelphia, PA 19106
        *Counsel for Appellant*

Robert A. Zauzmer, Esq. [ARGUED]
Bernadette A. McKeon, Esq.
Virgil B. Walker, Esq.
Office of United States Attorney
615 Chestnut Street
Suite 1250
Philadelphia, PA 19106
        *Counsel for Appellee*

_____

OPINION OF THE COURT
_____


VANASKIE, *Circuit Judge.*

Appellant Amin De Castro challenges the District Court's denial of his motion to suppress evidence and statements obtained by a police officer during a street encounter, arguing that he was unreasonably seized when the officer asked him to remove his hands from his pockets. Discerning no error in the District Court's finding that the officer's request was not a seizure, we will affirm the judgment of conviction entered on April 12, 2017.

## I.

During the early evening hours of September 22, 2014, an anonymous source called 911 to report a Hispanic male pointing a gun at juveniles outside a vacant flower shop on the 1800 block of North 31st Street in Philadelphia, Pennsylvania. The suspect was reportedly wearing a gray shirt, gray pants, and a bucket hat. Philadelphia Police Officer John Mulqueeney, who had been assigned to that area for approximately thirteen years and knew about the drug and firearm activity prevalent there, was dispatched minutes after the call was placed. He stopped his cruiser approximately fifteen to twenty feet from De Castro and his neighbor, who were speaking outside of the vacant flower shop. De Castro was wearing a light gray bucket hat, a gray striped shirt, and gray camouflage pants.

As Officer Mulqueeney exited his car and approached the men, De Castro turned toward Officer Mulqueeney. "At a distance of approximately [five to ten] feet, Officer Mulqueeney used a polite, conversational, and non-threatening tone to ask De Castro if he would remove his hands from his pockets." (App. at 11.) De Castro complied, revealing a green pistol grip protruding from his pants pocket. Officer Mulqueeney asked De Castro to raise his hands higher, and removed a loaded firearm from De Castro's pocket. When asked if he had identification or a permit to carry the firearm, De Castro replied that he had neither, but that he had a passport from the Dominican Republic. Officer Mulqueeney handcuffed De Castro and frisked him, finding in De Castro's pocket a loaded magazine containing ammunition that matched the firearm. Additional officers arrived on-scene as Officer Mulqueeney placed De Castro under arrest.

3

Following a trial, De Castro was convicted of being an alien in possession of a firearm, in violation of 18 U.S.C. § 922(g)(5)(A). The District Court, however, granted him a new trial "due to [his] trial counsel's constitutionally deficient representation." (App. at 11.) Pending his new trial, De Castro filed a motion to suppress all statements and physical evidence obtained by Officer Mulqueeney during the September 22, 2014, encounter, contending that the stop was unconstitutional.

After conducting an evidentiary hearing, the District Court determined that Officer Mulqueeney's request for De Castro to remove his hands from his pockets did not constitute a seizure under the Fourth Amendment. The District Court opined that Officer Mulqueeney, who responded to the scene alone, "neither ordered nor repeatedly asked De Castro to comply. Instead, he used a polite, conversational, and non-threatening tone to communicate his single request from a distance of at least five feet, with his weapon holstered and without any physical touching." (App. at 13.) The Court thus concluded that De Castro was not seized at that moment because "a reasonable person would have felt free to decline Officer Mulqueeney's lone request." (*Id.*) Moreover, even assuming, *arguendo*, that the request was a seizure, the District Court nonetheless found that it was supported by reasonable suspicion.[1] As such, the District Court denied De Castro's suppression motion, and De Castro subsequently pled guilty to the offense. He was sentenced to time served plus a two-year term of supervised release, and was then deported to the Dominican Republic. He timely appealed.

---

[1] Since we conclude that the request was not a seizure, we need not address the question of whether there was reasonable suspicion.

4

## II.

The District Court had jurisdiction under 18 U.S.C. § 3231, and we have jurisdiction under 28 U.S.C. § 1291. Since the District Court's factual findings are not in dispute, our review is plenary. *United States v. Givan*, 320 F.3d 452, 458 (3d Cir. 2003) (citations omitted).

## III.

The Fourth Amendment protects against "unreasonable searches and seizures." U.S. Const. amend. IV. We have observed, however, that "not every interaction between a police officer and a citizen is protected by the Fourth Amendment." *United States v. Smith*, 575 F.3d 308, 312 (3d Cir. 2009). Rather, "[p]olice encounters with citizens fall into one of three broad categories, each with varying degrees of constitutional scrutiny: '(1) police-citizen exchanges involving no coercion or detention; (2) brief seizures or investigatory detentions; and (3) full-scale arrests.'" *United States v. Brown*, 765 F.3d 278, 288 (3d Cir. 2014) (quoting *United States v. Perez*, 443 F.3d 772, 777 (11th Cir. 2006)).

Analyzing whether a police encounter in the second category comported with the Fourth Amendment requires a two-step inquiry: "Was there in fact a seizure? If so, was that seizure reasonable?" *Smith*, 575 F.3d at 313. Regarding the first step, the Supreme Court has observed:

> [L]aw enforcement officers do not violate the Fourth Amendment by merely approaching an individual on the street or in another public place, by asking him if he is willing to answer some questions, by putting questions to him if

5

> the person is willing to listen, or by offering in evidence in a criminal prosecution his voluntary answers to such questions . . . . The person approached, however, need not answer any question put to him; indeed, he may decline to listen to the questions at all and may go on his way . . . . If there is no detention—no seizure within the meaning of the Fourth Amendment— then no constitutional rights have been infringed.

*Florida v. Royer*, 460 U.S. 491, 497-98 (1983) (plurality opinion) (internal citations omitted).[2]

The Supreme Court elaborated on this holding one year later in *Immigration & Naturalization Service v. Delgado*, stating:

> our recent decision in *Royer* . . . plainly implies that interrogation relating to one's identity or a request for identification by the police does not, by itself, constitute a Fourth Amendment seizure . . . . While most citizens will respond to a police request, the fact that people do so, and do so

---

[2] Notably, the Court in *Royer* concluded that asking Royer to produce his airline ticket and driver's license "were no doubt permissible in themselves," but that a seizure was thereafter effected "when the officers identified themselves as narcotics agents, told Royer that he was suspected of transporting narcotics, and asked him to accompany them to the police room, while retaining his ticket and driver's license and without indicating in any way that he was free to depart . . . ." *Royer*, 460 U.S. at 501.

without being told they are free not to respond, hardly eliminates the consensual nature of the response . . . . Unless the circumstances of the encounter are so intimidating as to demonstrate that a reasonable person would have believed he was not free to leave if he had not responded, one cannot say that the questioning resulted in a detention under the Fourth Amendment.

466 U.S. 210, 216 (1984).[3]

Police conduct rises to the level of a "seizure" when, "by means of physical force or a show of authority, [a person's] freedom of movement is restrained." *United States v. Mendenhall*, 446 U.S. 544, 553-55 (1980) (holding that agents' requests for an individual to produce her plane ticket and identification, "without more, did not amount to an intrusion upon any constitutionally protected interest"). "Only when such restraint is imposed is there any foundation whatever for invoking constitutional safeguards." *Id.* at 553. "[T]he test for existence of a 'show of authority' is an objective one: not whether the citizen perceived that he was being ordered to restrict his movement, but whether the officer's words and actions would have conveyed that to a reasonable person." *California v. Hodari D.*, 499 U.S. 621, 628 (1991) (citation omitted). A person is thus "seized" when he or she yields to the show of authority. *Id.* at 626.

---

[3] In *Delgado*, the Court ruled that questioning workers inside a factory about their citizenship status while immigration agents were stationed at the factory's exits did not effectuate a seizure for Fourth Amendment purposes. *Delgado*, 466 U.S. at 219-20.

Factors tending to indicate a seizure include "the threatening presence of several officers, the display of a weapon by an officer, some physical touching of the person of the citizen, or the use of language or tone of voice indicating that compliance with the officer's request might be compelled." *Mendenhall*, 446 U.S. at 554. *Compare Brown*, 765 F.3d at 289 (holding that "[t]here was nothing about the detectives' brief initial approach that constituted a Fourth Amendment seizure" when the detectives "did not activate their lights or sirens, brandish their weapons, block [the defendant's] path, physically touch [the defendant], or make any threats or intimidating movements"), *and Smith*, 575 F.3d at 314 (holding that an individual was not seized when an officer repeatedly asked the question, "Where is your girl's house?" because "[t]here was no overt indication the questioning was not part of a consensual encounter between the officer and [the individual]"), *with United States v. Brown*, 448 F.3d 239, 245 (3d Cir. 2006) (holding that an individual was "seized" when he turned and placed his hands on the police vehicle after the officer told him "that a robbery victim was being brought over to identify [him and another individual] as possible suspects and, if they were not identified, they would be free to go—necessarily implying that they were not free to leave"), *and Johnson v. Campbell*, 332 F.3d 199, 205-06 (3d Cir. 2003) (finding that "it became clear that [the individual] could not refuse [the officer's repeated] requests" to roll down his car window, and was thus seized).

To determine whether Officer Mulqueeney's request constituted a seizure, the District of Columbia Court of Appeals' decision in *United States v. Barnes*, 496 A.2d 1040 (D.C. 1985), is instructive. There, an officer was patrolling a high crime area when he observed Appellee Keith Barnes

8

standing outside a men's clothing store, peering up and down the street, while another individual went in and out of the store a few times. *Barnes*, 496 A.2d at 1041. The officer, finding their behavior to be "suspicious," approached and asked Barnes to remove his hands from his pockets. *Id.* Barnes complied and voluntarily answered the officer's question about his reason for being there ("just hanging around"), and any prior arrests (previously arrested for armed robbery). *Id.* The officer then "observed a bulge in the stomach area of [Barnes's] windbreaker which 'looked unusual.'" *Id.* After feeling the bulge and suspecting it was a gun, the officer asked Barnes to place his hands on the police car and then removed a revolver from Barnes's jacket. *Id.* Barnes was arrested on weapons charges, and subsequently moved to suppress the gun and ammunition seized by the officer. *Id.* The trial court ruled in Barnes's favor, concluding that "the facts did not 'justify a suspicion sufficient to stop [Barnes] and to conduct a search.'" *Id.*

On appeal, the Court of Appeals addressed the "threshold question of . . . [w]hen did the seizure occur?" *Id.* at 1042. If it occurred at the moment when Barnes was asked to take his hands out of his pockets, then a Fourth Amendment violation had been committed because the police did not then have reasonable suspicion to believe that criminal activity was afoot. It was only after Barnes answered that he was "just hanging around" and had a prior arrest for armed robbery, coupled with the observations the officer had made of Barnes's companion repeatedly entering and exiting a store, that the officer had the requisite reasonable suspicion to effectuate "an investigatory detention and protective frisk." *Id.* at 1045. As to the status of the encounter before the officer conducted the

frisk, the Court of Appeals held that was "consensual," explaining:

> Officer Clark's request that [Barnes] remove his hands from his pockets (which was no more intrusive than a request for identification), followed by two questions and [Barnes's] "voluntary answers," . . . met the Supreme Court test for a pre-seizure, "consensual encounter." There are no indications of "intimidating" circumstances . . . . Officer Turner remained in the car while Officer Clark alone approached [Barnes]. Clark did not touch [Barnes] or draw a gun. Clark's requests that [Barnes] remove his hands from his pockets and answer two questions were nonintimidating; there was no threatening language or any indication that Clark used a severe tone of voice. In short, nothing happened—under Supreme Court analysis—that would have warranted [Barnes's] reasonable belief that he was not free to ignore the questions and walk away.

*Id.* at 1045 (citations omitted). Accordingly, the Court of Appeals reversed the trial court order suppressing the evidence obtained as a result of the protective frisk. *Id.*

It is further instructive to note that many state courts to have reviewed the issue have likewise determined that an officer's request that a person take their hands out of their pockets is not alone sufficient to convert an otherwise voluntary encounter into a seizure. *See, e.g., State v. Jennings*, 99 P.3d 1145, 1150 (Kan. Ct. App. 2004) ("We . . . find that the request for the men to remove their hands from their

10

pockets did not turn this voluntary encounter into a seizure."); Wayne R. LaFave, *Search and Seizure* § 9.4(a) (5th ed. 2012) (citations omitted) (quoting *Florida v. Bostick*, 501 U.S. 429, 435 (1991)) (noting that a seizure does not occur "'as long as the police do not convey a message that compliance with [a] request is required,' and the same is true of a request that the suspect remove his hands from his pockets"). Indeed, although not at issue here, many courts have applied this rationale to instances in which the officer does so in the form of a direction rather than a request. *See, e.g.*, *United States v. Broomfield*, 417 F.3d 654, 656 (7th Cir. 2005) (holding that an officer did not seize the defendant where, before asking him a question, "[a]ll that the officer had said was take your hands out of your pockets, an obvious precaution since it was dark and an armed robber was on the loose"); *State v. Walker*, 764 S.E.2d 804, 806 (Ga. 2014) (finding that defendant "was not *seized* within the meaning of the Fourth Amendment by [officer's] direction that he remove his hands from his pockets") (emphasis in original); *State v. Fortun-Cebada*, 241 P.3d 800, 805 (Wash. Ct. App. 2010) ("[W]e conclude the direction to remove [a person's] hands from his sweatshirt pocket did not convert a permissible social contact into a seizure."). Courts have further recognized that officers routinely make such requests for their own safety and not necessarily for investigative purposes. *See, e.g.*, *State v. Hamilton*, 36 So. 3d 209, 214 (La. 2010) (holding that police officers' "instruction to remove [the defendant's] hands from his pocket . . . was based on concerns for officer safety and did not communicate an intent to stop, seize, or search the defendant"); *State v. Nettles*, 855 P.2d 699, 712 (Wash. Ct. App. 1993) (noting that "it is not unreasonable to permit a police officer in the course of an otherwise permissive encounter to ask an individual to make his hands visible").

11

With this analysis in mind, we turn to the encounter between De Castro and Officer Mulqueeney. De Castro urges us to find that Officer Mulqueeney's request was a seizure, contending that Officer Mulqueeney made a show of authority by arriving in his patrol car, "immediately focusing on [De Castro] and walking toward him, . . . asking him to take his hands out of his pockets." (Appellant's Br. at 13.) While De Castro acknowledges Officer Mulqueeney's "conversational tone," he nonetheless argues that "even a polite request for someone to take his hands out of his pockets constitutes a show of authority if a reasonable person would not feel free to refuse." (*Id.*) De Castro also makes a public policy argument based on the recent history of police encounters resulting in death, arguing that "[a] reasonable person in [his] shoes would have been well aware of the many tragic stories suggesting that failing to comply with a police officer's request – especially conveying a threat by refusing to show hands – can end in death." (*Id.* at 19.)

We reject De Castro's arguments in light of the *Mendenhall* factors and *Barnes*. Officer Mulqueeney was the only officer present during the initial encounter, and made a sole, polite, and conversational request for De Castro to remove his hands from his pockets, rather than an order for him to show his hands. No weapons were drawn, and no threats were made. Officer Mulqueeney did not communicate to De Castro—either through words or actions—that he was not free to leave. Rather, it was appropriate for Officer Mulqueeney to request that De Castro remove his hands from his pockets for the safety of himself and others. *See Rodriguez v. United States*, 135 S. Ct. 1609, 1616 (2015) (recognizing the governmental interest in officer safety during traffic stops, which are "especially fraught with danger to police officers"

12

(quoting *Arizona v. Johnson*, 555 U.S. 323, 330 (2009))); *Broomfield*, 417 F.3d at 656 (7th Cir. 2005) (holding that, in the midst of a robbery investigation, an officer's request for an individual to remove his hands from his pockets did not constitute a seizure because the request was "an obvious precaution since it was dark and an armed robber was on the loose"). And finally, the totality of the circumstances indicates that a reasonable person in De Castro's position would have felt free to ignore the officer's request and end the encounter. *See Mendenhall*, 446 U.S. at 554. We thus hold that Officer Mulqueeney's request for De Castro to remove his hands from his pockets did not constitute a seizure.

Holdings of our sister circuits finding a seizure when officers made similar requests are distinguishable. For example, an officer's request for an individual to remove his hands from his pockets constituted a seizure where there were multiple officers present and the location was actively being searched for drugs when the individual arrived. *See United States v. Jackson*, 901 F.2d 83, 83 (7th Cir. 1990). The Seventh Circuit found that the request "implie[d] that [the officers] anticipate[d] some potential menace from [the individual]," and "[i]n th[ose] circumstances he would be foolhardy to try to leave." *Id.* at 84. *See also United States v. Camacho*, 661 F.3d 718, 729 (1st Cir. 2011) (finding a "substantial show of authority" when officers "cut[] off [two individuals'] path with an unmarked police car, order[ed] [the first individual] to put his hands on the hood, ask[ed] [the second individual] 'accusatory' questions, and order[ed] [him] to take his hands out of his pockets"). Indeed, we have ruled similarly in this regard. *See, e.g.*, *United States v. Lowe*, 791 F.3d 424, 431-32 (3d Cir. 2015) (finding that officers approaching an individual "in a hurried manner" and with a firearm drawn displayed a

show of authority when they made five to ten requests for the individual to show his hands).  A seizure has also been recognized when an individual ignored an officer's first request for him to remove his hands from his pockets, causing the officer to "repeat[] the question in an increasingly loud voice a few more times . . . ."  *United States v. Dubose*, 579 F.3d 117, 119 (1st Cir. 2009).

Here, by way of contrast, there was no similar show of authority or intimidating conduct on the part of Officer Mulqueeney.  He was alone.  He did not brandish a firearm.  He spoke in a conversational tone.  De Castro voluntarily removed his hands from his pockets, thereby revealing a weapon that furnished Officer Mulqueeney with the necessary reasonable suspicion to seize the gun.  Accordingly, the District Court did not err in denying De Castro's suppression motion.

## IV.

For the foregoing reasons, we will affirm the judgment of conviction entered on April 12, 2017.