Filed 10/18/19

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| In re JEREMIAH S., a Person Coming Under the Juvenile Court Law. | |
| THE PEOPLE,<br>        Plaintiff and Respondent,<br>v.<br>JEREMIAH S.,<br>        Defendant and Appellant. | A155856<br><br>(Alameda County<br>Super. Ct. No. JV02989902) |

Jeremiah S., a minor, appeals from jurisdiction and disposition orders entered by the juvenile court (Welf. & Inst. Code, § 800).[1]  A San Francisco juvenile court had denied Jeremiah's motion to suppress evidence obtained from a patdown search for weapons ("patsearch") and found true the allegation that Jeremiah had committed second-degree robbery.  The matter was transferred to Alameda County, where a wardship proceeding was already pending, and the juvenile court declared wardship and placed Jeremiah on probation on various terms.

On appeal, Jeremiah contends his suppression motion was erroneously denied. We agree.  Based on our independent review of the undisputed facts, we conclude the officer who conducted the patsearch did not present specific and articulable facts to support a reasonable suspicion that Jeremiah was armed and dangerous.  In so concluding, we decline to recognize a rule that would essentially validate any patsearch

---

[1]     All further statutory references are to this code unless otherwise indicated.

1

of a suspected robber who is lawfully detained following a report of a fresh robbery, regardless of the particular circumstances.  Accordingly, we reverse the jurisdiction and disposition orders and remand the matter to the juvenile court for further proceedings consistent with this opinion.

## FACTUAL AND PROCEDURAL BACKGROUND

At around 11:20 p.m. on July 2, 2018, Ornin Gosuwin was carrying a crossbody bag and holding an iPhone as she walked on Spear Street toward Market Street in San Francisco.  She saw two "young black men" coming from around the corner.  Both were wearing hoodies, one of which had a blue hue.  As Gosuwin stopped to let the young men pass, one of them pushed her left shoulder and caused her to fall to the ground.  As the two young men stood over her and began pulling her bag and phone away, one of them demanded, "Give me your phone, bitch."  Gosuwin resisted, but the assailants eventually obtained her phone and purse and continued on Market Street in the direction of the Embarcadero.  Gosuwin suffered scratches and bruises around her neck from the strap of her bag.

After the attack, Gosuwin went to a nearby building, where a security guard called the police.  San Francisco Police Officer Kristoffer Stoffel arrived and obtained Gosuwin's description of the two individuals and the stolen items.  Gosuwin did not see any weapons on her assailants, and she did not report that any weapons were used.

An officer used the "Find My iPhone app" to try to locate Gosuwin's phone.  The map indicated that Gosuwin's phone was "pinging" on the Embarcadero near either Pier 19 or Pier 17 before being turned off.  Officers later found Gosuwin's purse on the ground on the Embarcadero near the Ferry Building.

At approximately 11:29 p.m., Officers Bryan Neuerburg and Anthony Halligan were on patrol when they received "a dispatch call for service for a robbery in the area of 51 Market Street."  Neuerburg and Halligan were dispatched to the area around Pier 19 to look for the two "robbery suspects."  They had been told that a purse and phone had been stolen and that the phone had been tracked to the area near Pier 19.  There was no radio broadcast that a weapon had been used in the incident, and Neuerburg was not otherwise

2

told that a weapon was used. The suspects were initially described as "two black male juveniles," but the description was updated to "young black males approximately in their 20s," with one suspect wearing a light blue or gray hoodie. As the officers drove along the Embarcadero, they noticed Jeremiah and J.A., both juveniles, walking northbound, and one was wearing what appeared to be a light gray hoodie. The officers followed them for several blocks, driving slowly while they confirmed the description of the suspects.

Officer Ryan Champlin and his partner were also dispatched to the area around Piers 19 through 33. They stopped Jeremiah and J.A. and instructed them to get close to the buildings on the sidewalk. Officers Neuerburg and Halligan arrived on the scene as Jeremiah and J.A. were being detained.

According to the police report, Jeremiah stood 5 feet, 5 inches tall and weighed 130 pounds. A police officer instructed Jeremiah to face a wall with his legs spread and his arms above his head. He did as instructed and made no sudden movements or attempts to run away. Officer Neuerburg did not notice any weapon-like bulges in Jeremiah's clothing, and there was nothing about Jeremiah's appearance, behavior, or actions to make him believe that Jeremiah was armed and dangerous. Nevertheless, Neuerburg believed Jeremiah was armed and dangerous because "a robbery occurred" and he knew that "most robberies involve a weapon or most robbers tend to have weapons on their persons."

As Officer Neuerburg began his patsearch, he immediately felt two phones in Jeremiah's pocket. Believing the phones were evidence of the reported robbery, Neuerburg asked if he could take them out of the pocket, and Jeremiah consented. One phone's background picture and password matched those of the victim's phone.

The San Francisco District Attorney's Office filed an amended wardship petition pursuant to section 602, alleging that Jeremiah, 14 years of age, committed felony violations of second-degree robbery (Pen. Code, § 211; count 1) and receiving stolen property (Pen. Code, § 496, subd. (a); count 2).

3

Jeremiah moved to suppress the evidence obtained from the patsearch. The motion was heard on July 30, 2018, at the same time as the contested jurisdiction hearing. After hearing testimony from Gosuwin and Officers Neuerburg, Halligan, Stoeffel, and Champlin, the juvenile court denied the motion to suppress. The court then found the count 1 allegation of second-degree robbery to be true and dismissed count 2. At the close of the jurisdiction hearing, the court ordered Jeremiah transferred to Alameda County where a previous wardship petition alleging that Jeremiah committed second degree robbery in Alameda County on June 13, 2018, was pending. Thereafter, Jeremiah admitted to a stipulated lesser offense of felony accessory (Pen. Code, § 32) for the June 13, 2018 offense. The juvenile court held a disposition hearing and declared wardship, deemed the San Francisco offense to be a felony, and placed Jeremiah on probation in his stepmother's home on various terms.

Jeremiah appealed from the disposition and jurisdiction orders.

### DISCUSSION

Jeremiah contends the juvenile court erred in denying his suppression motion because the officer who patsearched him had no specific and articulable facts to support a reasonable suspicion that he was armed and dangerous. Conversely, the People contend the patsearch was valid because Jeremiah was a suspect in a robbery, and all forms of robbery are likely to involve a weapon. For the reasons below, we conclude the patsearch cannot be upheld.

The Fourth Amendment of the United States Constitution guarantees the right to be free of unreasonable searches and seizures by law enforcement personnel. (*Terry v. Ohio* (1968) 392 U.S. 1, 8–9 (*Terry*).) If an officer has a reasonable suspicion, supported by specific and articulable facts, that criminal activity is afoot, the officer may conduct a brief, investigative stop. (*Id.* at pp. 21–22.) Additionally, if the officer conducting the so-called *Terry* stop believes the suspect is armed and dangerous, the officer may perform a limited search of a person's outer clothing for weapons, i.e., a patsearch, whether or not the officer has probable cause to arrest. (*Id.* at pp. 27, 30.)

4

The principles governing patsearches are settled.  (*Minnesota v. Dickerson* (1993) 508 U.S. 366, 373 (*Dickerson*).)  Because a patsearch "is a serious intrusion upon the sanctity of the person, which may inflict great indignity and arouse strong resentment," it is subject to Fourth Amendment restrictions and "not to be undertaken lightly."  (*Terry*, *supra*, 392 U.S. at p. 17.)  The "sole justification" of the patsearch "is the protection of the police officer and others nearby."  (*Id*. at p. 29.)  Its purpose "is not to discover evidence of crime, but to allow the officer to pursue his [or her] investigation without fear of violence."  (*Dickerson,* at p. 373.)  Such a search—which is "permitted without a warrant and on the basis of reasonable suspicion less than probable cause—must be strictly 'limited to that which is necessary for the discovery of weapons which might be used to harm the officer or others nearby.' "  (*Ibid*., quoting *Terry*, at p. 26.)

The validity of a patsearch depends on the totality of the circumstances and turns on whether "a reasonably prudent [person] in the circumstances would be warranted in the belief that his [or her] safety or that of others was in danger."  (*Terry*, *supra*, 392 U.S. at p. 27; see *People v. Avila* (1997) 58 Cal.App.4th 1069, 1074.)  This requires that the officer provide "specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant [the] intrusion."  (*Terry*, at p. 21.)  In this regard, "due weight" is given to the specific reasonable inferences that the officer "is entitled to draw from the facts in light of his [or her] experience."  (*Id*. at p. 27.)  Although the officer need not be "absolutely certain" the individual is armed, an "inchoate and unparticularized suspicion or 'hunch' " is insufficient.  (*Ibid*.)  Moreover, a protective search that "goes beyond what is necessary to determine if the suspect is armed . . . is no longer valid under *Terry* and its fruits will be suppressed."  (*Dickerson*, *supra*, 508 U.S. at p. 373.)

Considerations relevant to this inquiry typically include visible bulges or baggy clothing that suggest a hidden weapon; sudden movements or attempts to reach for an object that is not immediately visible; evasive and deceptive responses to an officer's questions about what the individual was doing; and unnatural hand postures that suggest an effort to conceal a weapon.  (*Thomas v. Dillard* (9th Cir. 2016) 818 F.3d 864, 877

5

(*Thomas*).)  Other relevant circumstances can include the type of crime at issue; the detained individual's suspected involvement in such a crime; and the searching officer's experience with such crimes and their associated weapon use in the particular location of the detention.  (E.g, *People v. Limon* (1993) 17 Cal.App.4th 524, 529–530, 534 [officer knew from experience that particular area in question was known for weapons and drugs]; cf. *Santos v. Superior Court* (1984) 154 Cal.App.3d 1178, 1184–1186 [patsearch invalidated where officer's search was based on standard procedure, officer's discretion, and his training].)  Conversely, an officer's initial suspicions may be dispelled by other facts encountered at the scene.  (See *Terry*, *supra*, 392 U.S. at p. 28 [suggesting that a suspect's response to an officer's approach might be sufficient to dispel reasonable suspicion that suspect is armed]; *Thomas*, at p. 877.)

A minor may move to suppress evidence obtained as a result of an unlawful patsearch.  (§ 700.1.)  In reviewing a ruling on a motion to suppress, we defer to the lower court's express and implied findings of fact if they are supported by substantial evidence.  (*People v. Glaser* (1995) 11 Cal.4th 354, 362 (*Glaser*); *In re William V.* (2003) 111 Cal.App.4th 1464, 1468.)  In determining whether, on the facts so found, the seizure was reasonable under the Fourth Amendment, we exercise our independent judgment. (*Glaser*, at p. 363.)

Here, the evidence considered by the juvenile court reflected that, in response to the radio dispatch of a reported robbery of a purse and an iPhone, four police officers converged simultaneously and detained Jeremiah and his companion just before midnight, in a lighted area with no foot traffic.  None of the testifying officers, however, cited the late hour, location, or lack of foot traffic as grounds for officer safety concerns. The two suspects appeared young and were smaller than the four officers, and there was no testimony that Jeremiah's physical size (5 feet, 5 inches tall, 130 pounds) presented a safety threat.  Jeremiah and his companion followed the officers' instructions and made no sudden movements.  There was no suggestion from the officers that the two juveniles made any furtive or unusual movements suggesting they might be concealing weapons. Officer Neuerburg specifically admitted that no weapons were mentioned in the radio

6

dispatch, that Jeremiah had no bulges in his clothing and was cooperative during the stop, and that there was nothing about Jeremiah's appearance, behavior, or actions to suggest he was armed and dangerous. Nonetheless, Neuerburg testified he frisked Jeremiah for weapons "due to the fact that robberies are committed with use of force or violence and often have weapons involved." When asked whether he had "any specific facts that led [him] to believe that Jeremiah was armed and dangerous," Neuerburg responded, "The facts that a robbery occurred, knowing that most robberies involve a weapon or most robbers tend to have weapons on their persons."

Based on this and other evidence, the juvenile court found it undisputed that the officers had reasonable suspicion to detain Jeremiah and his companion. The court then addressed the validity of the patsearch. After acknowledging that the officers "must have specific and articulable facts related to Jeremiah," the court expressly noted Officer Neuerburg's testimony that no weapons were mentioned in the radio dispatch and that he did not see any bulges in Jeremiah's clothing. The court also referenced Neuerburg's testimony that "there was nothing about Jeremiah's behavior and action at the time that made [Neuerburg] think that Jeremiah was armed and dangerous." Nonetheless, in finding that Neuerburg "specified other facts that justified the pat down," the court emphasized Neuerburg's testimony that Jeremiah was a robbery suspect, and that "in the officer's experience, robbers tend to have weapons, even though in this case there had been no report of weapons being used in the robbery in question." Citing *People v. Osborne* (2009) 175 Cal.App.4th 1052 (*Osborne*), the court held that when a robbery suspect is reasonably and lawfully detained, "the right to frisk or to do the pat search must be immediate and automatic, and the reason for the stop is an articulable suspicion of a crime of violence, which is also true in this case."[2]

We do not agree the patsearch comported with Fourth Amendment standards. Here, the sum and substance of the case for upholding the search was Officer Neuerburg's testimony that (1) reasonable suspicion justified Jeremiah's detention as a

---

[2]     Jeremiah does not contest the finding that the *Terry* stop was lawful.

suspect in the robbery of a purse and a phone that had just occurred and (2) it was his experience that robbers tend to have weapons. Although Jeremiah's suspected involvement in a robbery is certainly an important fact in considering the totality of the circumstances, Neuerburg articulated no other aspect of the stop that, together with Jeremiah's status as a robbery suspect, would give rise to a reasonable belief that the officers were dealing with an individual who may be armed and dangerous. To the contrary, Neuerburg admitted he had no information indicating the reported robbery involved a weapon, and he acknowledged that Jeremiah was cooperative during the stop and that nothing about Jeremiah's appearance, behavior, or actions caused him to think Jeremiah had a weapon. Where, as here, the record is lacking in specific and articulable facts indicating that a particular suspect may be armed and dangerous, a patsearch for weapons is an impermissible intrusion. (*Terry*, *supra*, 392 U.S. at p. 20.)

Notwithstanding the requirement that patsearches be supported by specific and articulable facts, the People contend the juvenile court correctly concluded that an immediate patsearch of a lawfully detained robbery suspect should always be permissible because robbery is a violent crime that is likely to involve a weapon. We are not convinced.

A per se type of rule that automatically permits a patsearch for every lawfully detained robbery suspect would be at odds with established Fourth Amendment jurisprudence. First and foremost, such a rule would contravene the "fact driven" (*Osborne*, *supra*, 175 Cal.App.4th at p. 1059) and "individualized" (*City of Indianapolis v. Edmond* (2000) 531 U.S. 32, 37) nature of the high court's test for evaluating these "severe, though brief" intrusions. (*Terry*, *supra*, 392 U.S. at pp. 24–25.) Not only would a per se rule undermine the requirement that an officer provide specific and articulable facts supporting a reasonable apprehension of an armed suspect, but it would also seem to set up a rebuttable presumption that impermissibly shifts the burden to the defendant to prove the unreasonableness of a challenged search.

Second, a per se rule would conflate the different standards and justifications for *Terry* stops and frisks. A lawful frisk does not inevitably follow from a lawful stop, and

8

each intrusion—the stop and the frisk—requires a separate analysis with its reasonableness independently determined. (*Terry*, *supra*, 392 U.S. at pp. 25–26; accord, *United States v. Thomas* (9th Cir. 1988) 863 F.2d 622, 628.) As a more "severe" intrusion upon personal security than a stop, a frisk must "be strictly circumscribed by the exigencies which justify its initiation"—namely, the search for weapons. (*Terry*, at pp. 25–26.) A per se rule that allows a frisk automatically after a stop for suspected robbery would threaten to "destroy the necessary distinction between the stop and frisk." (*Ramirez v. City of Buena Park* (9th Cir. 2009) 560 F.3d 1012, 1022 [detained individual's testy behavior and suspected drug use did not justify *Terry* frisk]; see *Santos v. Superior Court*, *supra*, 154 Cal.App.3d at pp. 1184–1186 [patsearch invalidated despite lawful detention for suspected loitering, a crime that connotes lingering in a particular place for the purpose of committing a crime as opportunity may be discovered].)

Third, it bears emphasizing that the crime of robbery in California encompasses "a broad range of conduct" and "includes a variety of unacceptable behavior." (*People v. Landers* (1976) 59 Cal.App.3d 846, 849.) Robbery is "accomplished by means of force or fear" (Pen. Code, § 211), but both need not be present, and the possession or use of a weapon is not an element of the crime (*People v. Hays* (1983) 147 Cal.App.3d 534, 551). To meet the force element, the degree of force need only be sufficient to overcome the victim's resistance. (E.g., *People v. Garcia* (1996) 45 Cal.App.4th 1242, 1245–1246 [intentional but light tap of victim's shoulder], disapproved on other grounds in *People v. Mosby* (2004) 33 Cal.4th 353, 365, fns. 2, 3; *People v. Clayton* (1928) 89 Cal.App. 405, 411 [robber hit cash box twice before it fell from under victim's arm.]) Even a purse snatching can constitute a robbery if the victim simply resists the effort to wrest the purse away. (E.g., *People v. Burns* (2009) 172 Cal.App.4th 1251, 1259–1260.) Likewise, robbery can be accomplished by fear alone (*Hays*, *supra*, 147 Cal.App.3d at p. 541), which can consist of mere intimidation without the use of threats, so long as it facilitates the taking of the property (e.g., *People v. Mullins* (2018) 19 Cal.App.5th 594, 604–605 [robbers' intimidating behavior at ATM machine caused fear in elderly victim]). Indeed,

the fear necessary to accomplish a robbery can be engendered by the relative size of the offender. (E.g., *People v. Brew* (1991) 2 Cal.App.4th 99, 104 ["considerably larger" robber interjected himself between victim and open cash register]. Thus, the breadth of conduct that can constitute robbery counsels against a per se rule for validating a type of search that must be predicated on a reasonable suspicion of an armed criminal suspect. (See *Thomas*, *supra*, 818 F.3d at p. 879 [rejecting broad categorical approach due to breadth of conduct constituting domestic violence].)

As support for recognition of a per se rule, the People cite Justice Harlan's concurrences in *Terry*, *supra*, 392 U.S. 1, and in *Sibron v. New York* (1968) 392 U.S. 40 (*Sibron*), and Professor LaFave's treatise on searches and seizures.

*Terry*, *supra*, 392 U.S. 1, was a robbery case in which the United States Supreme Court upheld a patsearch by an officer who had no direct knowledge that the three suspects he detained were armed. In contrast to the situation here, however, the officer was acting on his own firsthand observations of the three suspects appearing to case a jewelry store (see *State v. Terry* (Ohio Ct.App. 1966) 214 N.E.2d 114, 116) and "acting in a manner he took to be preface to a 'stick-up.' " (*Terry*, at p. 28.) Justice Harlan's concurring opinion in *Terry* sought to "make explicit" what he thought was "implicit" in the majority's opinion—that during a *Terry* stop, "the right to frisk must be immediate and automatic if the reason for the stop is . . . an articulable suspicion of a crime of violence." (*Id*. at pp. 33–34 (conc. opn. of Harlan, J.).) In a later concurring opinion in *Sibron*, *supra*, 392 U.S. 40, Justice Harlan wrote that "the right to frisk is automatic when an officer lawfully stops a person suspected of a crime whose nature creates a substantial likelihood that he is armed." (*Id*. at p. 74 (conc. opn. of Harlan, J.).) Highlighting Justice Harlan's concurrence in *Terry*, Professor LaFave writes: "Lower courts have been inclined to view the right to frisk as being 'automatic' whenever the suspect has been stopped upon the suspicion that he has committed, was committing, or was about to commit a type of crime for which the offender would likely be armed, whether the weapon would be used to actually commit the crime, to escape if the scheme went awry, or for protection against the victim or others involved. This includes such suspected

10

offenses as robbery, burglary, rape, assault with weapons, car theft, homicide, and dealing in large quantities of narcotics."  (4 LaFave Search and Seizure (5th ed. 2012) § 9.6(a), pp. 853–854, fns. omitted.)

Notably, many of the robbery cases cited by LaFave involved specific reports that a weapon was used in the commission of the offense.[3]  And in nearly all of the remaining cases, the courts recounted other specific circumstances in the record that reasonably justified a patsearch on officer safety grounds.[4]  The only case cited by LaFave (and the People in this appeal) that justified a patsearch solely on the report of a robbery and the fact that the defendant fit the robber's description is *Russell v. State* (Fla.App. 1982) 415 So.2d 797.

We are aware of only three published California decisions citing the relevant language from Justice Harlan's concurrences:  *Osborne*, *supra*, 175 Cal.App.4th 1052, *People v. Heard* (1968) 266 Cal.App.2d 747 (*Heard*), and *People v. Coston* (1990) 221 Cal.App.3d 898 (*Coston*).  These decisions, however, do not advance the People's position because, reasonably viewed, their holdings were based on the officers' personal observations of the particular defendants' appearances and behaviors, and, in *Heard* and *Coston*, on specific reports of weapons.

In sum, it appears the vast weight of authority proffered by the People does not apply the language of Justice Harlan's concurring opinions in the manner urged here.

---

[3]    (E.g., *United States v. Abdus-Price* (D.C. Cir. 2008) 518 F.3d 926, 928; *State v. Faulks* (S.D. 2001) 633 N.W.2d 613, 618; *State v. Collard* (Mont. 1997) 951 P.2d 56, 58; *State v. Kyles* (Conn. 1992) 607 A.2d 355, 363; *Newman v. State* (Ind. 1987) 505 N.E.2d 442, 444.).

[4]    (E.g., *United States v. Johnson* (9th Cir. 2009) 581 F.3d 994, 1000; *United States ex rel. Richardson v. Rundle* (3d Cir. 1972) 461 F.2d 860, 863; *United States v. Barnes* (D.C. App. 1985) 496 A.2d 1040, 1041.  See also *United States v. Ward* (8th Cir. 1994) 23 F.3d 1303, 1304–1306 [although court seemed to uphold a patsearch on bare premise that "many (if not most) robbers are armed," the particular circumstances indicated that the suspect had been found lurking in a dark alley near a gas station and that the suspect had admitted he had just been released from county jail, had given conflicting and untruthful answers to the officers' questions, and had "appeared jumpy" during questioning].)

For all the foregoing reasons, we decline to recognize a rule that would be tantamount to automatically validating patsearches in all lawful detentions related to a fresh robbery report, regardless of the particular circumstances. In doing so, we do not suggest that an officer's *lack* of knowledge about the particulars of a robbery offense cannot serve to heighten his or her concerns of the unknown when encountering a robbery suspect. Thus, where an officer has neither the time nor the means to obtain additional information about a reported robbery before encountering a suspect, that circumstance can and should be taken into account, along with all other relevant circumstances, in deciding whether a patsearch was justified.

In closing, we emphasize we are deeply mindful of the admonition that "[t]he judiciary should not lightly second guess a police officer's decision to perform a pat-down search for officer safety. The lives and safety of police officers weigh heavily in the balance of competing Fourth Amendment considerations." (*People v. Dickey* (1994) 21 Cal.App.4th 952, 957.) Our rejection of the per se rule urged here is not an act of second-guessing decisions made by a police officer in the heat of the moment. Rather, it is a reaffirmation of the fact-driven and individualized nature of the test for patsearches under *Terry* and its progeny.

## CONCLUSION AND DISPOSITION

Because the record in this case discloses there were no specific and articulable facts supporting a reasonable suspicion that Jeremiah was armed and dangerous, the patsearch at issue did not comport with the Fourth Amendment, Jeremiah's motion to suppress was erroneously denied, and the jurisdiction and disposition orders based on the erroneous denial of suppression, were flawed. Accordingly, the jurisdiction and disposition orders are reversed, and the matter is remanded to the Alameda County juvenile court for further proceedings consistent with this opinion.

12

_____
Fujisaki, J.

WE CONCUR:


_____
Siggins, P. J.


_____
Wick, J.*

---

*     Judge of the Superior Court of Sonoma County, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

13

In re Jeremiah S./People v. J.S.

(A155856)

Trial court:        Alameda County

Trial Judges:       Hon. Scott Jackson and Hon. Roger C. Chan

Attorneys:          Elizabeth H. Eng, under appointment by the First District Court of
                    Appeal, for Defendant and Appellant.

                    Xavier Becerra, Attorney General, Gerald A. Engler, Chief Assistant
                    Attorney General, Jeffrey M. Laurence, Senior Assistant Attorney
                    General, Eric D. Share, Supervising Deputy Attorney General,
                    Ronald E. Niver, Deputy Attorney General, for Plaintiff and
                    Respondent.