*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

# DISTRICT OF COLUMBIA COURT OF APPEALS

No. 17-CF-1382

ANTHONY D. HOOKS, APPELLANT

V.

UNITED STATES, APPELLEE.

Appeal from the Superior Court
of the District of Columbia
(CF2-6952-17)

(Hon. Danya A. Dayson, Trial Judge)

(Argued February 14, 2019                    Decided May 30, 2019)

*Christine Pembroke* for appellant.

*Bianca Forde*, Assistant United States Attorney, for appellee. *Jessie K. Liu*, United States Attorney, and *Elizabeth Trosman*, *John P. Mannarino*, *Gauri Gopal*, *Puja Bhatia*, and *Maryam L. Adeyola*, Assistant United States Attorneys, were on the brief for appellee.

Before THOMPSON, EASTERLY, and MCLEESE, *Associate Judges*.

EASTERLY, *Associate Judge*: Anthony Hooks appeals from his convictions, following a jury trial, for felon in possession of a weapon and related offenses.[1] He argues that the trial court should have granted his motion to suppress the contraband found on his person because the police violated his rights under the Fourth Amendment when they seized and searched him. We agree and reverse.

## I. Facts and Procedural History

On a Sunday afternoon in April 2017, Mr. Hooks attended a barbeque outside the home of his friend, Latisha Toney, on Congress Street Southeast. As the setting is relevant to the legal issues presented, we describe it in some detail. Ms. Toney's residence is the end unit of a set of townhouses. From the street, her neighbors' houses are to the left, and a grassy yard surrounded by a metal fence is to the right. Whereas all her neighbors' front doors face Congress Street, Ms. Toney's front door faces the enclosed yard. To reach Ms. Toney's home and the yard from the street, a visitor must climb six steps from the sidewalk and walk

---

[1] Mr. Hooks was convicted of four crimes in all: felon in possession of a firearm, D.C. Code § 22-4503(a)(1), (b)(1) (2013 Supp.); possession of an unauthorized firearm, D.C. Code § 7-2502.01(a) (2015 Supp.); possession of a large capacity ammunition feeding device, D.C. Code § 7-2506.01(b) (2013 Supp.); and unlawful possession of ammunition, D.C. Code § 7-2506.01(a)(3) (2013 Supp.).

down a concrete path. The path is lined on either side by fencing that opens up on the left to give access to another set of steps up to Ms. Toney's front door, and on the right to give access to the yard.[2]

Having eaten some hot dogs and hamburgers, Mr. Hooks was sitting in a folding lawn chair on this concrete path. The other guests, a handful of adults and at least one child, were in the enclosed yard. Around 5:00 p.m., four police officers in the Narcotics Special Investigation Division drove past in an unmarked police car. According to the undisputed testimony of Ms. Toney, the police car stopped a few houses past her yard and then reversed back towards her home. Officer Dominique Tyson and three other members of his team, Officers Travis Collins, Brock Vigil, and Sean Hodges, all armed and in uniform, exited the vehicle.[3] With Officer Tyson in the lead, the four proceeded up the steps from the sidewalk onto the concrete pathway between Ms. Toney's house and the enclosed yard, and headed straight for Mr. Hooks in his lawn chair.

---

[2] The concrete path continues to the rear of the row of townhouses. There is no evidence in the record indicating that it reconnects with a public street.

[3] Officer Tyson testified at the suppression hearing that his team was on its way from one "buy and bust" operation to another when they "[s]aw a large group of males hanging out. Well, a group of individuals hanging out. Appeared to be -- some were holding cups, which was consistent with drinking alcohol, so we were just going to make contact with them."

Officer Tyson instructed Mr. Hooks to "get up."[4]   At the suppression hearing, Officer Tyson acknowledged he intended these two words as a command:

> Q.    [T]here was no question that he was going to get up?
> A.    Yes, he was going to have to move.
> Q.    He was going to have to move?
> A.    Yes.
> Q.    Okay.  And, if he hadn't moved, you would have snatched him; right?  You would have helped him move?
> A.    He would have got help, yes.

In response to Officer Tyson's instruction, Mr. Hooks immediately stood up. During this encounter, Officer Tyson observed a bag of marijuana sticking out of Mr. Hooks's coat pocket.[5]  Based on Mr. Hooks's admission that he was carrying a

---

[4]  Officer Tyson later testified that he issued his command because he was concerned he would not be able to get past Mr. Hooks without bumping into him. He disavowed any interest in Mr. Hooks, but disagreed with defense counsel's proposition that Mr. Hooks was not doing anything wrong.  Officer Tyson explained his understanding that "In D.C., you can't block a passage.  Passage meaning any walkway that the public has immediate access to because you can't block a walkway because someone ha[s] to walk around you[.]"

[5]  The record is not entirely clear as to when Officer Tyson observed the drugs, but the United States has not argued in this court that he saw them before Mr. Hooks complied.  We therefore assume for purposes of our decision that Officer Tyson did not see the bag until after Mr. Hooks stood up.

little more than two ounces of marijuana,[6] the police handcuffed Mr. Hooks, and in a search incident to arrest recovered a handgun.

Prior to trial, Mr. Hooks moved to suppress all tangible items seized by the police as fruits of an illegal seizure and search. After a hearing, the trial court denied the motion. The court agreed that the government had proved that either (1) Mr. Hooks had not been seized when the police commanded him to stand up and he complied, or (2) pursuant to *Terry v. Ohio*, 392 U.S. 1 (1968), the police had reasonable articulable suspicion to briefly stop Mr. Hooks because, by virtue of where he was sitting in his lawn chair, he was violating D.C. Code § 22-1307 (2013 Supp.) by "obstructing [a] walkway."

## II. Standard of Review

The government introduces its discussion of our standard of review with a pair of statements: "[t]his Court's review of a trial court's denial of a motion to suppress is limited," and "[t]his Court's role in reviewing the denial of a

---

[6] It is "lawful . . . for any person 21 years of age or older to . . . [p]ossess, use, purchase, or transport marijuana weighing 2 ounces or less." D.C. Code § 48-904.01(a)(1)(A) (2015 Supp.).

suppression motion is to ensure that the motions judge had a substantial basis for concluding that no constitutional violation occurred."[7]  We pause to clarify, lest these statements evince a misunderstanding that our analysis of constitutional questions under the Fourth Amendment is somehow constricted.  It is not. Although we accept the trial court's findings of fact unless they are clearly erroneous and we review the facts and reasonable inferences therefrom in the light most favorable to the prevailing party, our review of the "trial court's legal conclusions [is] de novo," *United States v. Lewis*, 147 A.3d 236, 239 (D.C. 2016) (en banc), as we have reaffirmed in countless decisions of this court,[8] including the cases to which the government cites.[9]

---

[7]  The government cites *Hampleton v. United States*, 10 A.3d 137, 142 (D.C. 2010), and *Womack v. United States*, 673 A.2d 603, 607 (D.C. 1996), for the first proposition, and *Howard v. United States*, 929 A.2d 839, 844–45 (D.C. 2007), and *Alston v. United States*, 518 A.2d 439, 440 n.2 (D.C. 1986), for the second.  The language "a substantial basis for concluding that no constitutional violation occurred" is actually a quotation from *Howard*, 929 A.2d at 844–45 (quoting *Thompson v. United States*, 745 A.2d 308, 312 (D.C. 2000)).

[8]  *See, e.g.*, *Posey v. United States*, 201 A.3d 1198, 1201 (D.C. 2019); *Miles v. United States*, 181 A.3d 633, 637 (D.C. 2018); *Pridgen v. United States*, 134 A.3d 297, 302 (D.C. 2016); *Robinson v. United States*, 76 A.3d 329, 335 (D.C. 2013).

[9]  *Hampleton*, 10 A.3d at 143 (acknowledging that our review of the legal question is de novo); *Howard*, 929 A.2d at 844 (same); *Womack*, 673 A.2d at 607 (same).  The "substantial basis" language from *Howard*, 929 A.2d at 844–45, does not point in a different direction.  Rather, that language appears to come from this court's decision in *Lawrence v. United States*, 566 A.2d 57 (D.C. 1989), where we made clear that it pertains to our review of the trial court's fact-finding:

(continued…)

### III. Fourth Amendment Analysis

The Fourth Amendment protects individuals against all "unreasonable searches and seizures." U.S. CONST. amend. IV. "This inestimable right of personal security belongs as much to the citizen on the streets of our cities as to the homeowner closeted in his study to dispose of his secret affairs." *Terry*, 392 U.S. at 8–9. It extends to individuals attending springtime barbeques in every quadrant of the District of Columbia. "For, as [the Supreme] Court has always recognized, [n]o right is held more sacred, or is more carefully guarded, by the common law[] than the right of every individual to the possession and control of his own person, free from all restraint or interference of others, unless by clear and unquestionable authority of law." *Id.* at 9 (internal quotation marks omitted).

---

(…continued)

> We give deference to the trial judge's findings of fact and must accept his resolution of conflicting testimony. Moreover, *the judge's factual findings will not be disturbed unless they are clearly erroneous, i.e., without substantial support in the record*. Nevertheless, the ultimate determination as to whether a seizure occurred remains a question of law.

*Id*. at 60 (internal citations omitted) (emphasis added).

### A. Whether Mr. Hooks Was Seized Within the Meaning of the Fourth Amendment

The preliminary question before us is whether the "restraint or interference" by the police in this case amounts to a seizure implicating Fourth Amendment protections. *Terry*, 392 U.S. at 9. As the Supreme Court explained in *Terry*, seizures are not limited to actual arrests, *id.* at 16–19,[10] but neither do they extend to "all personal intercourse between policemen and citizens." *Id.* at 19 n.16; *accord Towles v. United States*, 115 A.3d 1222, 1228 (D.C. 2015) (acknowledging that "[a] seizure does not occur simply because a law enforcement officer approaches a person on the street and asks him or her questions" (quoting *Jackson v. United States*, 805 A.2d 979, 984 (D.C. 2002)). The dispositive question "is whether, taking into account all of the circumstances surrounding the encounter, the police conduct would have communicated to a reasonable person that he was not at liberty to ignore the police presence and go about his business."[11] *Florida v.*

---

[10] *See also California v. Hodari D.*, 499 U.S. 621, 625–26 (1991) (reaffirming that a seizure is not limited to an arrest and occurs when an "officer, by means of physical force *or show of authority*, has in some way restrained the liberty of a citizen," so long as the individual yields to the exercise of force or show of authority).

[11] Another formulation of the test asks whether a reasonable person would have felt "free to leave," *Michigan v. Chesternut*, 486 U.S. 567, 573 (1988); *Jackson*, 805 A.2d at 983–84, but the protections of the Fourth Amendment extend to situations where a citizen has no desire to go elsewhere and instead simply

(continued…)

*Bostick*, 501 U.S. 429, 437 (1991) (quoting *Chesternut*, 486 U.S. at 569); *id.* at 436 ("[T]he appropriate inquiry is whether a reasonable person would feel free to decline the officers' requests or otherwise terminate the encounter."); *Towles*, 115 A.3d at 1228; *Sharp v. United States*, 132 A.3d 161, 169 (D.C. 2016) (holding defendant was seized "in the absence of any sign that a reasonable person in these circumstances would believe the officer was giving him a genuine choice to decline the request"). Thus, we ask whether a reasonable person in Mr. Hooks's position would have felt free to ignore the police officers who converged on him in his lawn chair, disregard their command to him to "get up," and go about his business of sitting in his lawn chair.

We conclude a reasonable person would not have felt such freedom after a team of four armed, uniformed officers drove past him and then reversed to get back to his location; all four officers emerged from the car; all four officers crossed the sidewalk and walked up the concrete walkway, bounded by fencing on either side, directly to where he was sitting in his lawn chair; and the lead officer, without any explanation, commanded him to "get up."

---

(…continued)
wishes to decline an encounter with the police. *See, e.g.*, *Florida v. Royer*, 460 U.S. 491, 493–94, 504–05 (1983) (plurality opinion) (passenger in an airport); *Sharp*, 132 A.3d at 164, 169 (individual sitting in a parked car).

We are guided in this determination by *United States v. Mendenhall*, 446 U.S. 544 (1980) (plurality op.), where the Supreme Court provided "[e]xamples of circumstances that might indicate a seizure," among them "the threatening presence of several officers, . . . or the use of language or tone of voice indicating that compliance with the officer's request might be compelled." *Id*. at 554.[12] As noted above, here we have both.

We are also guided by our precedent, which requires a "realistic" assessment of the totality of the circumstances. *Jackson*, 805 A.2d at 988. Such realism requires the acknowledgement that "an encounter in which a visibly armed police officer in full uniform . . . emerges without warning from a police cruiser to interrupt a person going about his private business is not an encounter between equals. . . . The officer, however well-intentioned and polite, initiates the meeting with an undeniable air of authority . . . ." (*Albert*) *Jones*, 154 A.3d at 595–96 (footnote omitted).[13] "The circumstances are more intimidating . . . if more than

---

[12] We do not mean to suggest that the *Mendenhall* factors are an exhaustive list; an individual may be seized even if none of them are present. *E.g.*, (*Albert*) *Jones v. United States*, 154 A.3d 591, 595–98 (D.C. 2017) (holding that appellant was seized even though the *Mendenhall* factors "were largely absent or of lesser import in th[e] case").

[13] (*Albert*) *Jones* is not at odds with *Ware v. United States*, 672 A.2d 557 (D.C. 1996), cited by the government, where we observed in a footnote that "an

(continued…)

one officer is present," as was the case here.[14]  *Id.* at 596.  In concluding there was a seizure in (*Albert*) *Jones*, we factored in the circumstance that the defendant was confronted by the police in a confined space, thereby "substantially reduc[ing] the ease with which [he] could have walked on or otherwise avoided the encounter." *Id.* at 597.  Here, Mr. Hooks's ability to avoid an encounter with the police was similarly compromised; he had four armed police officers occupying the concrete path in front of him, a lawn chair behind him, and metal fencing to either side.  In further comparison with (*Albert*) *Jones*, where we relied in part on the seizing officer's request to view an object Mr. Jones was holding, *id.* at 593-98, the lead officer did not merely ask Mr. Hooks to allow access to an object; the officer issued a command to Mr. Hooks to get up—a command that reasonably could have

---

(…continued)

officer's mere approach" does not without more constitute a seizure.  *Id.* at 561 n.8.  *Ware* relied on *Kelly v. United States*, 580 A.2d 1282, 1285 (D.C. 1990), in which we explained that "*it is not enough* for [a defendant] to assert that police are inherently figures of authority, and that their presence . . . *without more*, convert[s] the encounter into a seizure."  580 A.2d at 1285–86 (internal quotation marks omitted) (first emphasis added); *see also Sharp*, 132 A.3d at 167 (explaining that "Kelly is a pure questioning case"), but did not reject the premise that law enforcement officers wield significant power in society by virtue of their possession of a badge and a gun.

[14]  The fact that the officers were armed is "not a negligible factor bearing on whether a reasonable person in [Mr. Hooks's] position would feel free to leave," even though they never drew their weapons.  *See* (*Albert*) *Jones*, 154 A.3d at 595 (citing *In re J.F.*, 19 A.3d 304, 309 (D.C. 2011) (identifying "the visibility of the officers' guns in their waistbands" as a factor in demonstrating that J.F. was seized)).

been perceived under the circumstances as a directive to submit his person to police control. *Cf. Sharp*, 132 A.3d at 169 (a reasonable person would not have understood the police officer's request to the driver to "step out of the vehicle" as "giving him a genuine choice to decline the request and stay in the car" but instead "conveyed a message that compliance with their request was required" (brackets omitted)).

Based on our examination of the totality of the circumstances, we conclude that Mr. Hooks was, by virtue of a show of authority, seized by the police within the meaning of the Fourth Amendment. We are unpersuaded by the government's citation to cases where this court did not find a seizure;[15] these cases are distinguishable. This court's decision in *United States v. Barnes*, 496 A.2d 1040 (D.C. 1985), in particular does not compel a different conclusion. In *Barnes*, an

---

[15] *Brown v. United States*, 983 A.2d 1023, 1025–26 (D.C. 2009) (officer twice asking, "in a normal tone," from "two to three feet away" if the defendant possessed any contraband did not amount to a seizure); *Lawrence*, 566 A.2d at 63 (single officer's approach of a defendant walking down the sidewalk coupled with his question in "a calm, conversational tone of voice, [about] what [defendant] had in his clenched hand" was not a seizure); *Richardson v. United States*, 520 A.2d 692, 697 (D.C. 1987) (single request to speak to defendant did not amount to seizure; defendant was only seized after he fled, discarding drugs in his possession); *United States v. Burrell*, 286 A.2d 845, 846–47 (D.C. 1972) (single request—"[h]old it, sir, could I speak with you a second?"—coupled with a touch to the elbow did not constitute a seizure).

officer who had seen the defendant on the street "approached [him] and asked him to remove his hands from his pockets," and then asked two "nonintimidating" questions. *Id*. at 1041, 1045. We held that the defendant had not been seized within the meaning of the Fourth Amendment because, on those facts, "nothing happened . . . that would have warranted appellee's reasonable belief that he was not free to ignore the questions and walk away." *Id.* at 1045. We cannot say the same of the instant case. Not only did *Barnes* involve a request as opposed to a command, the surrounding circumstances in *Barnes*, inter alia, the fact that the defendant was approached by only one officer, and "there was no . . . indication that [the officer] used a severe tone of voice," were distinct. *Id*.

**B. Whether the Police Had Reasonable Articulable Suspicion to Justify Mr. Hooks's Seizure**

Consistent with the Fourth Amendment, the police may, based on "probable cause to believe that an individual is committing or, in the case of a felony, has committed a crime," conduct an arrest; alternatively, based "[u]pon a lesser showing of a reasonable suspicion supported by specific and articulable facts that the individual is involved in criminal activity[,] . . . [police] may conduct a correspondingly less intrusive seizure: a brief stop," commonly referred to as a *Terry* stop, "for investigatory purposes." *Robinson*, 76 A.3d at 335–36 (citations

and internal quotation marks omitted). The government has never argued that the police had probable cause to arrest Mr. Hooks. At trial, as on appeal, its position was that the police had legitimate grounds to conduct a *Terry* stop.

Generally, when we assess whether the police conducted a valid *Terry* stop, our focus is on whether the quantum of information known to the police officer conducting the stop amounted to reasonable, articulable, particularized suspicion that the individual was engaged in criminal activity. *See, e.g.*, *Robinson*, 76 A.3d at 331, 337–40. Here we need not engage in this sufficiency-type analysis, however, because it is clear as a matter of law that Mr. Hooks did not commit the crime that the government asserts the police reasonably suspected him of committing.

The government argues that the officers could have reasonably believed that Mr. Hooks was violating the District's anti-"crowding, obstructing, or incommoding" statute, D.C. Code § 22-1307.[16] Based on our review of the plain

---

[16] Pursuant to *Devenpeck v. Alford*, 543 U.S. 146, 153 (2004), the government was not bound by Officer Tyson's initial reason for diverting his team to the enclosed yard outside Ms. Toney's home—his apparent suspicion that her guests were violating the District's open container law, see note 3 *supra*—and it has not sought to rely on this suspicion on appeal (likely because there was no testimony that Mr. Hooks was holding a beverage). Thus, we do not assess

(continued…)

language, we disagree. D.C. Code § 22-1307(a) makes it "unlawful for a person, alone or in concert with others":

> (1) To crowd, obstruct, or incommode:
>
>> (A) The use of any street, avenue, alley, road, highway, or sidewalk;
>>
>> (B) The entrance of any public or private building or enclosure;
>>
>> (C) The use of or passage through any public building or public conveyance; or
>>
>> (D) The passage through or within any park or reservation; *and*
>
> (2) To continue or resume the crowding, obstructing, or incommoding after being instructed by a law enforcement officer to cease the crowding, obstructing, or incommoding.

§ 22-1307(a) (emphasis added). The statute thus plainly identifies two separate actus reus circumstance elements that must be satisfied before a person's conduct becomes criminal. First, a person must "crowd, obstruct, or incommode" one of several enumerated locations, § 22-1307(a)(1)(A–D). Second, the person must "continue or resume the crowding, obstructing, or incommoding after being instructed by a law enforcement officer to cease." § 22-1307(a)(2).[17] Because

---

(…continued)

whether that rationale would have given the police authority to seize him, although it is not obvious that it would. *See* D.C. Code § 25-1001(a) (2014 Supp.) (making it unlawful to possess an open container of alcohol only in specifically defined public spaces); *Campbell v. United States*, 163 A.3d 790, 795–96, 798 (D.C. 2017) (narrowly interpreting D.C. Code § 25-1001(a)).

[17] In the section-by-section analysis of the 2012 legislation, the Judiciary Committee explained that certain revisions were being made to clarify some

(continued…)

there is nothing in the record to indicate that, before the police seized Mr. Hooks, they either instructed him to cease "crowding, obstructing, or incommoding" a protected area under the statute, or that he disregarded such an instruction, there is simply no basis for any belief that Mr. Hooks was violating D.C. Code § 22-1307.[18]

In its brief to this court, the government argues that, even if they were mistaken, the officers reasonably could have believed that the walkway leading to Ms. Toney's front door and the enclosed yard "was covered by § 22-1307" and thus their seizure of Mr. Hooks could be upheld under the Supreme Court's decision in *Heien v. North Carolina*, 135 S. Ct. 530, 536, 539 (2014) (holding that

---

(…continued)
ambiguous language in the 2010 "Blocking Passage" statute, but that "[i]t is imperative, as well, to re-affirm that any of the described activity under this subsection [(a)(1)] *is only made criminal after a law enforcement officer has ordered dispersal and the person (or persons) resumes or continues the same conduct*."  D.C. Council, Report on Bill 19-645 at 42 (Nov. 29, 2012) (emphasis added).

[18]  Because we conclude that the record is devoid of any evidence to satisfy the second actus reus circumstance element, we do not address whether the police could have reasonably believed Mr. Hooks had committed the first actus reus circumstance element, i.e., crowding, incommoding, or obstructing the "entrance of any public or private building or enclosure," under § 22-1307(a)(1)(B), the specific subsection relied upon by the government.  Thus we avoid addressing the question, which was not briefed, of whether § 22-1307(a)(1)(B) either was meant to apply within private property or could legitimately do so.

"reasonable suspicion can rest on a mistaken understanding of the scope of a legal prohibition" so long as that misunderstanding is "*objectively* reasonable"). But as explained above, we do not resolve this case on the ground that the walkway in question is not covered by § 22-1307. Thus, we have no cause to say whether such an error would fall within the bounds of mistakes allowed by *Heien*. We are certain, however, that the officers' suspicion that Mr. Hooks had committed a crime simply because he engaged in conduct described in D.C. Code § 22-1307(a)(1)(B) is not such a mistake: It is not objectively reasonable to think that a person has committed a crime because the police have information indicating he violated half of a statute. As discussed at oral argument, no one would say that a person committed the crime of carrying a pistol without a license where he does not have a gun license, but also has no gun. Similarly here, even assuming Mr. Hooks was blocking a walkway "covered by § 22-1307," the police had no basis to think that he was continuing to do so after being asked to disperse. We thus have no difficulty concluding that the *Heien* exception does not apply to this case.

### C. Whether Suppression Is Required

Because Mr. Hooks was seized without the requisite reasonable articulable suspicion, the trial court should have granted his suppression motion. It has long been the law that evidence collected in violation of the Fourth Amendment is

considered "fruit of the poisonous tree" and generally may not be used by the government to prove a defendant's guilt. *Wong Sun v. United States*, 371 U.S. 471, 484, 488 (1963) (explaining the exclusionary rule deters avoidable police misconduct and "make[s] effective the fundamental constitutional guarantees of [the] sanctity of the home and inviolability of the person"); (*Prince*) *Jones v. United States*, 168 A.3d 703, 717 (D.C. 2017) ("[T]he exclusionary rule forbids the use of improperly obtained evidence at trial . . . [and] is designed to safeguard Fourth Amendment rights generally through its deterrent effect." (internal quotation marks, citations, and alterations omitted)).

The government argues, however, that "for the same reason[]" we should find no Fourth Amendment violation at all under *Heien*, we should likewise conclude that application of the exclusionary rule is inappropriate in this case. We draw the opposite conclusion. For the same reason the police did not make a reasonable mistake of law, there is a strong case for deterrence through suppression of the contraband recovered from Mr. Hooks. The government looks to the Supreme Court's decision in *Herring v. United States*, 555 U.S. 135 (2009). But the factual mistake that caused the Court to reconsider the cost-benefit analysis of the exclusionary rule as applied in *Herring* is miles away from the legal error

before us.[19] In *Herring*, the police unknowingly relied on an arrest warrant that had been recalled months earlier but, "because of a negligent bookkeeping error" by other police employees, was never deleted from a law enforcement database. *Id*. at 137–38. While cautioning that it was not "suggest[ing] that all recordkeeping errors by the police are immune from the exclusionary rule," the Court determined that the deterrent value of suppressing evidence "obtained in objectively reasonable reliance on a subsequently recalled warrant" would be "marginal or nonexistent." *Id*. at 146. By contrast, here we have a patently unlawful seizure by officers unaware of the letter of the law they were trying to enforce. The circumstances of this case are precisely those we want to deter and amply justify the application of the exclusionary rule. *See id*. at 146 (rejecting the argument that its "decision will cause police departments to deliberately keep their officers ignorant" and acknowledging that the exclusionary rule should apply when the police behave recklessly).

---

[19] Even assuming that *Herring* applies to mistakes of law in addition to mistakes of fact, because *Heien* postdated *Herring*, *Herring* had no cause to address whether unreasonable mistakes of law which are not excused under *Heien*, 135 S. Ct. at 539, could be exempted from the exclusionary rule.

As the government has not attempted to argue that the admission of the illegally seized contraband was harmless beyond a reasonable doubt,[20] and harmlessness is not "obvious,"[21] we reverse and remand for such further proceedings as are consistent with this opinion.

*So ordered.*

---

[20] *See Chapman v. California*, 386 U.S. 18, 24 (1967).

[21] *Randolph v. United States*, 882 A.2d 210, 226 (D.C. 2005) (explaining that "it is only in the rare circumstance in which harmlessness is obvious that we are prepared to find an error harmless notwithstanding the government's failure to make a timely claim of harmlessness").