*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

# DISTRICT OF COLUMBIA COURT OF APPEALS

No. 19-CF-346

HARRY A. CREWS, APPELLANT,

v.

UNITED STATES, APPELLEE.

Appeal from the Superior Court of the
District of Columbia
(CF2-5279-18)

(Hon. Ronna Lee Beck, Trial Judge)

(Argued  January 26, 2021                    Decided  November 10, 2021)

*Mindy A. Daniels* for appellant.

*David P. Saybolt*, Assistant United States Attorney, with whom *Timothy J. Shea*, United States Attorney, and *Elizabeth Trosman*, *John P. Mannarino*, and *Ariel Dean*, Assistant United States Attorneys, were on the brief, for appellee.

Before BLACKBURNE-RIGSBY, *Chief Judge*, THOMPSON,[*] *Associate Judge*, and FERREN, *Senior Judge*.

---

[*] Judge Thompson was an Associate Judge of the court at the time of January 26, 2021. Judge Thompson's term expired Saturday, September 4, 2021; however, she will continue to serve as an Associate Judge until her successor is confirmed. *See* D.C. Code § 11-1502 (2012 Repl.) ("Subject to mandatory retirement at age 74 and to the provisions of subchapters II and III of this chapter, a judge of a District of Columbia court appointed on or after the date of enactment of the District of Columbia Court Reorganization Act of 1970 shall serve for a term of fifteen years,

BLACKBURNE-RIGSBY, *Chief Judge*: Appellant Harry Crews appeals the denial of his motion to suppress a handgun recovered from his person and seeks correction of his sentence. Following a jury trial, appellant was convicted of carrying a pistol without a license ("CPWL") outside his home or place of business; possession of an unregistered firearm; and unlawful possession of ammunition.[1] Appellant argues that the trial court incorrectly determined the point of seizure and that he was unlawfully seized by Metropolitan Police Department ("MPD") officers while on the landing to his apartment as he tried to unlock his apartment door. Appellant also requests that this court review his Judgment and Commitment Order, which reflects a felony CPWL conviction even though, the jury was only instructed with the elements of misdemeanor CPWL.

We vacate the trial court's denial of the motion to suppress and remand the case for further findings as to whether (1) there was a show of authority by officers

---

and upon completion of such term, such judge shall continue to serve until the judge's successor is appointed and qualifies."). She was qualified and appointed on October 4, 2021, to perform judicial duties as a Senior Judge and will begin her service as a Senior Judge on a date to be determined after her successor is appointed and qualifies.

[1] Carrying a pistol without a license outside home or place of business (D.C. Code § 22-4504(a)(1) (2012 Repl. & 2021 Supp.)); possession of an unregistered firearm (D.C. Code § 7-2502.01(a) (2018 Repl.)); and unlawful possession of ammunition (D.C. Code § 7-2506.01(a)(3) (2018 Repl.)).

and, relatedly, (2) appellant submitted to a show of authority. In addition, we ask the trial court to clarify whether (and, if so, when) the officers had reasonable articulable suspicion to conduct an investigatory stop prior to the frisk. We do not reach the issue relating to the Judgment and Commitment Order.

## I.

### A. Hearing on Motion to Suppress

On February 4, 2019, the trial court held a pretrial evidentiary hearing to address appellant's motion to suppress a pistol recovered by MPD. After hearing testimony from the sole witness, MPD Officer Jendy Olivo, the trial court denied appellant's motion to suppress, crediting the officer's testimony with respect to what happened and what he personally observed. Officer Olivo testified that he is a patrol officer for the Seventh District with specialized training in recognizing characteristics associated with armed gunmen. Officer Olivo described the neighborhood around the 1500 block of Eaton Road S.E. as a place leading to the 2600 block of Burnie Place, an area known to officers for continuous drug and gun related arrests.

Officer Olivo testified that around midnight on April 5, 2018, he along with two other officers, Officers Labun and Gramieri, all dressed in full uniform, were patrolling the 1500 block of Eaton Road in their marked squad car. Officer Olivo was in the backseat of the vehicle, Officer Gramieri was driving, and Officer Labun was in the front passenger seat. As Officer Olivo was unable to see from the back seat, the other officers informed him that as appellant was exiting his car and saw the police vehicle approaching, he turned the front of his body into and pressed it against his vehicle. The officers found this turning away unusual. Officer Olivo explained that "for individuals to press their body against a vehicle" is "common upon seeing police officer[s,] to avoid officers being able to see any unusual bulges or objects weighing down their center area or like jackets."

Officer Olivo further testified that after passing the appellant, Officer Gramieri turned the police vehicle around and drove back to the location where appellant was last seen. Officer Olivo exited the police vehicle and began canvassing the area around appellant's vehicle, eventually entering a fenced area with a red building. Upon entering the fenced area, Officer Olivo testified that he saw exterior stairs leading to a covered upper-level landing which was surrounded by railing and led to the door of appellant's apartment. The landing was at a second-floor level and had no other access points.

Officer Olivo was at the bottom of the stairs when he saw appellant standing on the upper landing. Due to very poor lighting, Officer Olivo shined his flashlight at appellant and said, "Hey what's up, can I talk to you real quick?" As Officer Olivo moved closer towards appellant, he testified that he could see appellant become nervous and try several times to hurriedly put his key into the keyhole of the apartment door to open it.

Officer Olivo stated he made his way up the stairs towards appellant. Noticing appellant's hurried and nervous state, Officer Olivo testified that he then said to appellant "no, I need to talk to you" in a more persistent tone.[2] In addition, Officer Olivo's body worn camera captured appellant responding to the officer, the clearest statement being, "For what?" Also, appellant momentarily paused his attempt to unlock his apartment door. When Officer Olivo was about three to four stairs away from appellant, he began asking if appellant had any weapons, but was interrupted when appellant turned to face him. Officer Olivo testified that he then saw an L-shaped weighted object in the front pocket of appellant's pull over hoodie. He then sprinted up the short distance up the stairs and bear hugged appellant to prevent

---

[2] In the body worn camera footage Officer Olivo states, "Nah, let me talk to you real quick."

access to the L-shaped weighted object, which he suspected was a firearm. While being bear hugged, appellant stated that he lived there (which was verified after appellant was taken to the police station).

According to Officer Olivo, Officers Labun and Gramieri followed closely behind him through the gate, also with their flashlights on. Officer Olivo testified that within five seconds of his bear-hugging appellant, Officer Gramieri helped secure appellant and Officer Labun conducted the pat down, and the object was removed from the pocket and discovered to be a firearm. After the firearm was recovered and the officers were waiting for back-up to arrive, Officer Olivio testified that appellant stated, "yes, I am breaking the law. But you broke the law to find out I was breaking the law. And [that] he only carries a firearm for protection because police are killing people and people are killing people."

In denying appellant's motion to suppress the recovered firearm on Fourth Amendment grounds, the trial court concluded that (1) the observation of appellant leaning into his car as the police vehicle passed did not give police reasonable articulable suspicion, but was something that caused officers to further investigate; however, the trial court further concluded that (2) once Officer Olivo was on the landing in front of appellant's apartment and saw the L-shaped weighted object in

the front pocket of appellant's hoodie, which Officer Olivo believed to be a gun, there was reasonable articulable suspicion justifying a *Terry* frisk. Therefore, the trial court concluded that Officer Labun's subsequent frisk of appellant was lawfully conducted, and the recovered firearm admissible.

However, the trial court was concerned with whether an officer has a "right to go on to somebody's else's property that [is] fenced" without reasonable articulable suspicion or if it is permissible to go beyond the fence to initiate a citizen contact. The trial court found that: (1) the fence around the building was see-through; (2) the gates were open; (3) there were two entrances to two different apartments; (4) each entrance had its own steps leading to it; (5) and the steps leading to the landing had an overhead cover. The trial court presumed the steps were curtilage and that Officer Olivo entered the curtilage. However, recognizing *Florida v. Jardines*, the trial court held that in the absence of signage prohibiting entrants beyond the open gate, Officer Olivo did not act beyond what a private citizen may do. 569 U.S. 1, 8 (2013) (determining an unarmed officer without a warrant may approach a home and knock on the door because it is no more than a private citizen may do).

The trial court concluded that Officer Olivo was legally on the property, including the stairs, because there was no "unlicensed intrusion," or use of any

"unlicensed physical intrusion." *See Jardines*, 569 U.S. at 7-8 (discussing whether an officer's investigation that took place on a constitutionally protected area was accomplished through an unlicensed physical intrusion, where there is an "implicit license" for a visitor to approach a home, knock on the door, and wait to be received). The trial court reaffirmed its conclusion that Officer Olivo did not have reasonable articulable suspicion when he initially entered up the stairs. However, the court found that Officer Olivo's physical intrusion — the bear hug upon appellant — was licensed, legal, and permitted the moment he observed the L-shaped weighted object in appellant's front pocket, which established reasonable articulable suspicion to then conduct a *Terry* frisk. Officer Olivo's bear hug, conducted for his own safety to prevent appellant from reaching for the suspected weapon, was therefore a lawful action preceding the frisk, said the court. Therefore, the trial court issued its final denial of appellant's motion to suppress.

### B. Trial and Sentencing

The relevant Fourth Amendment evidence presented at trial mirrored the evidence presented at the motion to suppress hearing. The only additional evidence admitted at trial, relevant to our review, pertains to the Judgment and Commitment Order, which reflects a felony CPWL conviction and requires proof beyond a

reasonable doubt that appellant carried the weapon "in a place other than the person's dwelling place" or "on other land possessed by the person." D.C. Code § 22-4504(a)(1). Throughout the presentation of the case the jury was presented with the elements for misdemeanor CPWL, which does not require the aforementioned element of proof that was put forward. *See* D.C. Code § 22-4504(a) ("No person shall carry within the District of Columbia either openly or concealed on or about their person, a pistol, without a license issued pursuant to District of Columbia law, or any deadly or dangerous weapon.").

At the start of trial while delivering voir dire instructions, the trial court informed the jury that appellant was charged with "[carrying] a pistol without a license, possession of an unregistered firearm, and unlawful possession of ammunition;" the elements of misdemeanor CPWL. Neither party objected to the court's recitation of the charges. Then, in the government's closing argument, with respect to the CPWL charge, it informed the jury of the elements of misdemeanor CPWL — "[e]ssentially you have to decide whether on April 5, 2018, the defendant was carrying a pistol and whether he had a license to carry that pistol, and whether that pistol was registered."

Before instructing the jury, the trial court took time to determine if, in the evidence presented, appellant made a prima facie case he was entitled to an exception instruction with respect to the CPWL charge. *See Fortune v. United States*, 570 A.2d 809 (D.C. 1990) (discussing the statutory exceptions pertaining to CPWL charges, such as dwelling place and other land possessed by a person). Specifically, the question was whether the appellant demonstrated that he did not carry the firearm outside his home or business, or outside land or premises possessed or controlled by him. Appellant's mother, Edith Crews, testified that he lived at the address where he was arrested for approximately two years with his girlfriend and child.

The trial court reasoned that the landing outside of appellant's apartment did not fall within the definition of dwelling because a dwelling is exclusively inside a home and does not include curtilage. The court decided not to instruct the jury with a dwelling exception in appellant's favor for the CPWL charge. The trial court, relying on *Fortune*, 570 A.2d 809, and *White v. United States*, 283 A.2d 21 (D.C. 1971), explained that appellant had the burden of making a prima facie case that he fit within an exception found in D.C. Code § 22-4504(a)(1) — that he was not a person carrying weapons "in a place other than the person's dwelling place" or the he was "on other land possessed by" him.

The trial court concluded that curtilage is not part of a dwelling such that the dwelling exception is applicable to appellant. Also, relying on *Hines v. United States*, 326 A.2d 247 (D.C. 1974), and again on *Fortune*, and *White*, the trial court concluded that a premises (or land possession) exception did not apply because appellant did not introduce evidence that he was on land possessed by him. The evidence presented was that appellant's address was the same as the building where he was seized and that appellant, his girlfriend and child had an apartment at that address. The trial court concluded that it was not enough that appellant was trying to open the upper exterior door to establish that appellant was on property that constituted "premises or land possessed" by him because the building was large and had two exterior staircases and two exterior doors. The trial court informed the parties that with respect to the CPWL instruction it would instruct the jury on the elements of "carr[ying] a pistol on or about his person voluntarily and on purpose, not by mistake or accident, and that he was not licensed to carry a pistol."

The trial court gave the following CWPL instruction to the jury:

> Carrying a pistol without a license. The elements of the offense of carrying a pistol without a license, each of which the government must prove beyond a reasonable doubt, are:

One, the defendant carried a pistol on or about his person.

Two, he did so voluntarily and on purpose and not by mistake or accident.

And three, the defendant was not licensed to carry the pistol by the chief of police of the District of Columbia.

The term pistol means a firearm that has a barrel less than 12 inches in length, where it was originally designed to be fired with a single hand. The term firearm means a weapon, regardless of operability, which will or is intended to expel a bullet by the action of an explosive.

The jury returned guilty verdicts on all charges against appellant.

On April 18, 2019, appellant was sentenced on the counts of felony CPWL; possession of an unregistered firearm; and unlawful possession of ammunition,[3] to concurrent sentences of six months' incarceration, the execution of all sentences suspended, and to one year of supervised release. This appeal followed.

## II.

### A. Fourth Amendment Seizure

---

[3] Carrying a pistol without a license outside home or place of business (D.C. Code § 22-4504(a)(1)); possession of an unregistered firearm (D.C. Code § 7-2502.01(a)); and unlawful possession of ammunition (D.C. Code § 7-2506.01(a)(3)).

Appellant contends that the point of seizure occurred before Officer Olivo saw the L-shaped weighted object in his pocket, which was prior to any opportunity officers may have had to establish reasonable articulable suspicion to conduct a *Terry* frisk; therefore, suppression of the firearm and statements to the police was required. The Fourth Amendment protects "the right of the people to be secure in their persons, houses, papers and effects, against unreasonable searches and seizures." U.S. CONST. amend. IV. A constitutionally permissible encounter between law enforcement and an individual can either be a "consensual encounter, which does not require any level of suspicion prior to initiation"; an "investigative detention, which if nonconsensual, must be supported by a reasonable, articulable suspicion of criminal activity prior to initiation"; or an "arrest, which must be supported by probable cause prior to initiation." *Gordon v. United States*, 120 A.3d 73, 78 (D.C. 2015) (cleaned up). "Both investigative detentions and arrests are seizures under the Fourth Amendment; mere consensual encounters are not." *Id.* (footnotes omitted). However, an encounter may begin consensually and, through either "the officer's show of authority or some other indication that the individual is not free to leave, become a nonconsensual seizure" that requires reasonable, articulable suspicion. *Towles v. United States*, 115 A.3d 1222, 1228 (D.C. 2015).

When reviewing a trial court's ruling on a motion to suppress, we defer to the trial court's factual findings unless they are clearly erroneous, but "[w]hether a seizure has occurred for Fourth Amendment purposes is a question of law which this court reviews de novo." *Jackson v. United States*, 805 A.2d 979, 985 (D.C. 2002). Likewise, the trial court's determination that an encounter was consensual is a legal conclusion that a seizure did not occur, which is also subject to de novo review. *Id.* at 985-86; *Sharp v. United States*, 132 A.3d 161, 166 (D.C. 2016). In assessing whether there was a seizure, we consider the totality of the circumstances to determine whether "police conduct would have communicated to a reasonable person" that they were "not free to decline the officers' requests or otherwise terminate the encounter." *Florida v. Bostick*, 501 U.S. 429, 439 (1991); *see Hooks v. United States*, 208 A.3d 741, 746 n.11 (D.C. 2019) ("Another formulation of the test asks whether a reasonable person would have felt 'free to leave,' . . . but the protections of the Fourth Amendment extend to situations where a citizen has no desire to go elsewhere and instead simply wishes to decline an encounter with the police."). In addition to a show of authority, for there to be a seizure the apprehended person must submit to the show of authority.[4] *See Pridgen v. United States*, 134 A.3d 297 (D.C. 2016); *Plummer v. United States*, 983 A.2d 323, 331 (D.C. 2009)

---

[4] *But see Torres v. Madrid*, 141 S. Ct. 989 (2021) (holding that the application of physical force to the body of a person with intent to restrain is a seizure even if the force does not succeed in subduing the suspect).

(quoting *Brendlin v. California*, 551 U.S. 249, 254 (2007)); *see also California v. Hodari D.*, 499 U.S. 621, 626, 628-29 (1991). In our analysis, "[t]he hypothetical reasonable person is an innocent person." *Dozier v. United States*, 220 A.3d 933, 941 (D.C. 2019). "Generally, when physical or testimonial evidence is uncovered by an illegal search or seizure, it must be suppressed as the 'fruit of the poisonous tree.'" *Wilson v. United States*, 102 A.3d 751, 753 (D.C. 2014) (citation omitted).

Appellant argues that the trial court erred in determining that the encounter began as consensual because he did not desire to interact with the police, and the officer's assertion that he needed to talk to appellant was a demand or else a demonstration of authority. Appellant contends his case is analogous to *Hooks v. United States*, 208 A.3d 741 (D.C. 2019) (reversing and remanding the trial court's denial of Hooks's motion to suppress because there was an unlawful Fourth Amendment seizure when four officers patrolling in a marked police vehicle passed Hooks sitting on a lawn chair at a barbeque, turned around, exited their vehicle, approached Hooks and commanded he stand up, which he did; the officers did not have reasonable articulable suspicion). In response, the government argues that the initial encounter was consensual, and that appellant was not seized because there was no show of authority from the officers that would otherwise indicate that he was

not free to leave. In addition, the government argues that if there was a show of authority there was no seizure because appellant did not submit to the authority.

We determine that is it unclear from the trial court's ruling whether the encounter was consensual because no findings were announced concerning if there was a show of authority and, if so, whether appellant submitted to authority. Thus, the trial court must resolve whether there was a seizure before Officer Olivo saw the L-shaped object in appellant's hoodie pocket. Additionally, although the trial court issued findings on whether the police had reasonable articulable suspicion to justify a frisk, it did not address the initial question of whether (and, if so, when) the officers had reasonable articulable suspicion to conduct an investigatory stop. We ask the trial court to also make initial findings and clarifications on this point as well.

First, the trial court must determine if there was a show of authority by assessing the totality of the circumstances; the test is whether police conduct communicates to a reasonable person that they are "not free to decline the officers' requests or otherwise terminate the encounter." *Bostick*, 501 U.S. at 439. We have explained that a show of authority need not be expressly communicated through verbal commands for there to be a seizure. *Cf. Dozier*, 220 A.3d at 941 (discussing that the implicit or explicit accusatory nature of questioning by officers can tend to

indicate a nonconsensual encounter with law enforcement). "[O]ur precedents direct [us to] take an 'earthy' and realistic approach to such street encounters" which requires recognition that police initiating an encounter have an "air of authority." (*Albert*) *Jones*, 154 A.3d 591, 595 (D.C. 2017) (quoting *Jackson v. United States*, 805 A.2d 979, 988 (D.C. 2002)). In *Dozier*, we determined that a seizure occurred "by the time appellant submitted to the officers' *request* to a pat-down." 220 A.3d at 941 (italics added). Although a verbal command may be a strong indicator in a seizure determination, our precedents do not require it.

We highlight some circumstances which generally can contribute to a conclusion that there was a nonconsensual encounter with law enforcement, i.e., a seizure: the sudden appearance of an officer in full tactical gear emerging from a vehicle; the officers' outnumbering other persons; accusatory nature of an officer's questioning, either implicitly or explicitly; officers' tone of voice; repeated or persistent questioning that conveys that the officers were not satisfied with the answers the person gave; officers' request that the person expose his waistband for visual inspection; and inability of a person to leave the area.[5]

---

[5] *See Dozier*, 220 A.3d at 941 (police officer in full uniform and tactical vest emerging without warning to interrupt a person going about his business); (*Albert*) *Jones v. United States*, 154 A.3d 591, 597 (D.C. 2017) (stating an encounter is "more intimidating if the person is by himself, if more than one officer is present, or

If it is determined there was a show of authority, the trial court will then make findings as to whether appellant submitted to it. At a minimum, submission requires "that a suspect manifest compliance with the police orders or requests." *Golden v. United States*, 248 A.3d 925, 935 (D.C. 2021) (citation omitted). There are instances when no submission to orders or requests is evident. *See Pridgen*, 134 A.3d at 304 (Pridgen failed to get on the ground following officer commands); *Plummer*, 983 A.2d at 326 (Plummer failed to immediately put his hands up after police commands). However, this case presents more nuanced circumstances and should be assessed as to whether "'in the absence of any sign that a reasonable person . . .

---

if the encounter occurs in a location that is secluded or out of public sight"); *Dozier*, 220 A.3d at 941-42 ("[A] reasonable person who can tell from the inquiries that the officer suspects him of something, and who cannot know whether the officer thinks there is sufficient reason to detain him, may well doubt that the officer would allow him to avoid or terminate the encounter and just walk away") (quoting (*Albert*) *Jones*, 154 A.3d at 596); *United States v. Barnes*, 496 A.2d 1040, 1045 (D.C. 1985) ("[T]here was no . . . indication that [the officer] used a severe tone of voice."); *Gordon v. United States,* 120 A.3d 73, 80-81 (D.C. 2015) ("[T]he officer seized Gordon by repeatedly questioning him before the police learned of his outstanding warrant."); *Golden,* 248 A.3d at 937 ("An ordinary reasonable and innocent person . . . would not feel free to frustrate the police inquiry . . . by refusing to expose their body for visual inspection to prove their innocence."); *Dozier*, 220 A.3d at 942 (Dozier was at the mouth of a narrow alley with a police car blocking part of the exit, and an officer exited the vehicle also partially obstructing exit); (*Albert*) *Jones*, 154 A.3d at 597 (Jones was in a narrow alley when the police vehicle pulled in; although he was able to get by the car, an officer exited the vehicle to stop and engage him); *Hooks*, 208 A.3d at 747-48 (Hooks, with a lawn chair behind him, and metal fencing to either side, was surrounded by four officers occupying the path in front of him and who commanded that he "get up").

would believe the officer was giving a genuine choice to decline the request[s],' the clear message conveyed to a person . . . was that his submission was required." *Golden*, 248 A.3d at 935 (quoting *Sharp v. United States*, 132 A.3d 161, 169 (D.C. 2016)).

We do not purport to decide the issues of authority and submission in this case, and instead note some of the circumstances we find relevant in assessing the nature of appellant's encounter. We find relevant: the time of day the encounter occurred; appellant being followed to his apartment door; the statements of Officer Olivo to appellant; the number of officers present; appellant being on an enclosed landing; appellant's response to Officer Olivo; and appellant's attempts to unlock his apartment door. With these in mind, the trial court shall make further detailed findings on the seizure issue.

## B. Appellant's Sentence

Next, appellant asks this court to review his Judgment and Commitment Order for a felony CPWL, despite the fact that the jury was instructed only on the elements of a misdemeanor CPWL (which does not include that appellant was carrying the firearm outside his home or business). Appellant highlights several different places

within the record in support of his assertion that there is an error in his sentence for felony CPWL. First, he points to the indictment as being ambiguous because it cites to D.C. Code § 22-4504(a)[6] which only contains language for misdemeanor CPWL and does not include the element of being outside the home or place of business, which is found in subparagraph (1) of section 22-4504(a) of the D.C. Code. Second, he highlights that the trial court's jury instructions and verdict form failed to include the required element of carrying outside the home or business. Third, appellant notes that the government failed to object to the CPWL instruction or the verdict form. The government admits it was error not to instruct the jury on the government's burden to also prove beyond a reasonable doubt that appellant was carrying the pistol

---

[6] Section 22-4504 of the D.C. Code, in relevant part states:

> (a) No person shall carry within the District of Columbia either openly or concealed on or about their person, a pistol, without a license issued pursuant to District of Columbia law, or any deadly or dangerous weapon. Whoever violates this section shall be punished as provided in § 22-4515, except that:
>
> (1) A person who violates this section by carrying a pistol, without a license issued pursuant to District of Columbia law, or any deadly or dangerous weapon, in a place other than the person's dwelling place, place of business, or on other land possessed by the person, shall be fined not more than the amount set forth in § 22-3571.01 or imprisoned for not more than 5 years, or both. . . .

outside his home or business; however, it claims it was harmless error because the evidence demonstrated that appellant was not in his home, business, or on land possessed by him when carrying the firearm.

A challenge as to the correctness of a jury instruction is a question of law which this court reviews de novo. *Buskey v. United States*, 148 A.3d 1193, 1205 (D.C. 2016). An improper jury instruction on an element of an offense is subject to harmless-error review not warranting automatic reversal. *Neder v. United States*, 527 U.S. 1, 19 (1999). We are tasked with determining "whether the record contains evidence that could rationally lead to a contrary finding with respect to the omitted element." *Id.* In other words, "even if the instructions had informed jurors of the omitted element, no reasonable juror could have found that appellant" was carrying the pistol in a place other than his dwelling, business, or on other land possessed by him, "and thus that the omission did not affect appellant's substantial rights." *Conley v. United States*, 79 A.3d 270, 291 n.3 (D.C. 2013) (Thompson, J., concurring in judgment), *see Neder*, 527 U.S. at 19 (explaining that omission of an element of offense from jury instructions may be harmless error if the evidence could not rationally have led to a contrary finding with respect to the omitted element).

The government focuses on the assertion that appellant was not within his home, business, or on land possessed by him with the firearm. We agree that appellant was not in his dwelling place or place of business. However, whether the stairs and elevated landing was land possessed by appellant is less clear. In the District of Columbia, the possession of land requires exclusive control and possession by the individual. *White v. United States*, 283 A.2d 21, 24 (D.C. 1971) ("[T]he individual must have exclusive control and possession of the premises."). Whether the appellant does or does not have exclusive control is a matter of fact to be determined by the jury. *Walker & Dunlop, Inc. v. Gladden*, 47 A.2d 510, 513 (D.C. 1946); *Greet v. Otis Elevator Co.*, 187 A.2d 896, 898 (D.C. 1963).

While the trial court suggests the stairs and landing are part of a shared yard and not exclusively controlled, we are of the belief the jury could have found a distinction between the stairs and the landing in this case. "When dealing with real property, [a possessory] interest entails more than the right to be physically present on the property; it encompasses also a right to exclude, both in its general sense and as it has been construed within the meaning of [the CPWL statute]." *Fortune v. United States*, 570 A.2d 809, 811 (D.C. 1990). The stairs and elevated landing in this case lead exclusively to appellant's apartment. Unlike in our other cases, the level of common or public use of the stairs and landing is less apparent. *See id.*

(appellant did not have exclusive control or possession of the shared backyard of the home in which he rented a room with his aunt); *Hines v. United States*, 326 A.2d 247, 249 (D.C. 1974) (appellant did not have exclusive control and possession of common area of apartment building); *White*, 283 A.2d at 24 (appellant did not have exclusive control and possession of a hallway on the floor above his apartment in an apartment building). However, in light of our decision to remand the case we need not resolve whether appellant had exclusive possession and control over the stairs and landing.[7]

## III.

We hold that the trial court's ruling on the motion to suppress is insufficient and further findings are to be made concerning whether there was a show of authority, and if so, whether appellant submitted to the authority. In addition, we sua sponte, seek clarification as to whether there was reasonable articulable suspicion to conduct an investigatory stop prior to the frisk. Therefore, the trial

---

[7] The government also argues that there is evidence that appellant walked from his car to the stairway, from which the jury could have found that appellant possessed the pistol during that time. However, in light of the remand on the motion to suppress, the resolution of which is uncertain, we decline to further address this issue, which may or may not arise.

court's denial of appellant's motion to suppress is vacated and the case is remanded for further findings.

*So ordered.*