J-S05040-24

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| Appellant | : | |
| | : | |
| | : | |
| v. | : | |
| | : | |
| | : | |
| JUSTIN MALIK NORRIS | : | No. 928 WDA 2023 |

Appeal from the Suppression Order Entered June 20, 2023
In the Court of Common Pleas of Mercer County Criminal Division at
No(s): CP-43-CR-0001413-2022

BEFORE: PANELLA, P.J.E., KING, J., and BENDER, P.J.E.

MEMORANDUM BY BENDER, P.J.E.:          **FILED: April 11, 2024**

The Commonwealth appeals from the order granting a motion to suppress filed by Appellee, Justin Malik Norris. The trial court determined that police officers unlawfully detained Appellee and that a firearm recovered during a physical altercation was fruit of the poisonous tree. The Commonwealth argues that the initial interaction between Appellee and the police constituted a mere encounter and that "observations of [Appellee] at the time of the mere encounter provided sufficient reasonable suspicion to initiate an investigative detention." Commonwealth's Brief at 10. We affirm.

The trial court set forth as follows its factual findings in its opinion and order denying suppression:

> On November 10, 2022, officers of the Hermitage Police Department were dispatched to 2417 East State Street, Hermitage[,] Pa, and the surrounding area. Yvonne Harkless had called the police non-emergency number because an unknown individual contacted her vehicle. Ms. Harkless had been waiting

in her vehicle in the China Wok parking lot, which was relatively empty, when the individual squeezed in between her vehicle and a column next to it. While next to her vehicle, the individual also briefly laid on it before leaving the area. Ms. Harkless provided the officers with a description of a male, in dark colored clothing, and wearing a face covering. Ms. Harkless testified that she did not describe his race or ethnicity because the face covering had made it difficult to discern.

Officers first approached the individual matching the description, later identified as [Appellee,] … next to the intersection of East State Street and North Kerrwood Drive. This intersection is located between the China Wok and the Kraynak[']s parking lot. Officers had first observed [Appellee] hopping and skipping in the Kraynak[']s parking lot before making his way to the intersection. Deputy Chief Nych approached [Appellee] and repeatedly asked him to step into the Kraynak[']s parking lot so he could ask him questions farther away from the intersection. Each time he was asked to move away from the intersection, [Appellee] ignored Deputy Chief Nych. Deputy Chief Nych told [Appellee], while still standing at the intersection, that they were there because they had received a non-emergency call regarding him, and [Appellee] showed signs of being nervous. When questioning [Appellee], officers observed him grabbing at his cargo pockets and they repeatedly told him to keep his hands out of his pockets. Eventually, [Appellee] attempted to enter the crosswalk but was grabbed by officers and they attempted to pull him back to the sidewalk. [Appellee] pulled away and the officers again grabbed him and pulled him to the ground where they put him in handcuffs. After [Appellee] was placed in handcuffs, officers found the slide of a handgun on the ground and the rest of the handgun was in the cargo pocket that he had been trying to grab.

Trial Court Opinion (TCO), 6/20/23, at 1-2.

Appellee filed a motion to suppress, which the trial court granted following an evidentiary hearing. The Commonwealth filed a motion for reconsideration, arguing that the court "fail[ed] to account for and consider a significant detail as part of the interaction – that [Appellee] was constantly reaching for his cargo pocket and jacket pockets, and that Deputy Chief Nych

observed an object in both side pockets." Motion for Reconsideration, 6/23/23, at 3-4. The Commonwealth emphasized that Appellee "obviously believed he was free to leave and chose to do so" when the officers asked him to step into the parking lot. *Id.* at 5. It claimed that "[i]t wasn't until Deputy Chief Nych and Officer Burnett grabbed [Appellee]'s arms to restrain him that the investigative detention began." *Id.* The Commonwealth asserted that there was reasonable suspicion to detain Appellee at this point because, during the prior mere encounter, "[Appellee] continued to reach towards his cargo pants pockets and jacket pockets." *Id.* at 6. It said that Appellee was "not detained when he was ordered to stop reaching towards his pockets," which "is an important factor up and until the investigative detention." *Id.*

The trial court ultimately denied the Commonwealth's motion for reconsideration, explaining as follows:

> Regardless, this [c]ourt maintains its finding that the encounter was, at its inception, an investigative detention, as the [o]fficers saw that [Appellee] did not want to speak to them and their insistence on the continuation of the encounter against his will, for any reason, would have led a reasonable person to believe that they were not free to leave. An obscure object in a cargo pants pocket, even if lawfully observed by the [o]fficers under a mere encounter, adds little to the finding of reasonable suspicion, as it does not make the commission of disorderly conduct without a weapon more or less likely.

Order, 6/29/23, at unnumbered 2.

The Commonwealth timely filed a notice of appeal and complied with the trial court's order to file a concise statement per Pa.R.A.P. 1925(b). The trial court filed a letter adopting its June 20, 2023 opinion. We have

jurisdiction, as the Commonwealth certified that the order substantially handicaps its prosecution under Rule 311(d). **See** Pa.R.A.P. 311(d) (stating that "the Commonwealth may take an appeal as of right from an order that does not end the entire case where the Commonwealth certifies in the notice of appeal that the order will terminate or substantially handicap the prosecution"). The Commonwealth raises one issue for our review:

> Whether the suppression court erred in granting … Appellee's Motion to Suppress Evidence and suppress[ing] evidence, specifically the firearm located on or about … Appellee's person, by holding the interaction between … Appellee and police officers was, from its outset, an investigative detention when the circumstances surrounding the encounter clearly establish the encounter was a mere encounter, not an investigative detention, and by failing to consider certain facts testified to by police officers, specifically … Appellee['s] reaching towards his pockets repeatedly and officers identifying an unknown object in Appellee's pockets[.]

Commonwealth's Brief at 4.[1]

> We apply the following principles in reviewing the trial court's order:

> When reviewing the grant of a suppression motion, we must determine whether the record supports the trial court's factual findings and "whether the legal conclusions drawn from those facts are correct." **Commonwealth v. Brown**, 64 A.3d 1101, 1104 (Pa. Super. 2013) (quoting **Commonwealth v. Cauley**, 10 A.3d 321, 325 (Pa. Super. 2010)). We may only consider evidence presented at the suppression hearing. **In re L.J.**, … 79 A.3d 1073, 1085–87 ([Pa.] 2013). In addition, because the defendant prevailed on this issue before the suppression court, we consider only the defendant's evidence and so much of the Commonwealth's evidence "as remains uncontradicted when read in the context of the record as a whole." **Brown**, 64 A.3d at 1104

---

[1] Appellee filed a no-answer letter, requesting that the trial court order be affirmed.

- 4 -

(quoting **Cauley**, 10 A.3d at 325). We may reverse only if the legal conclusions drawn from the facts are in error.

**Commonwealth v. Haines**, 168 A.3d 231, 234 (Pa. Super. 2017).

As a prefatory matter, we set forth the uncontradicted testimony concerning Appellee's actions that purportedly created a threat to the officers' safety. Deputy Chief Nych testified that when he first encountered Appellee, he "asked him what was going on and how he was doing, and there was no response." N.T., 6/6/23, at 40. He continued:

Q. Okay. And while you were talking to him, was he making any movements that you saw?

A. Yes. At that time I think I said I just want to talk to him about something that occurred in the parking lot with a female. He got real nervous and he started reaching down to his cargo pocket area of his pants. He looked down at it multiple times. The cargo pockets of the pants that he was wearing were rather tight, and I could see that there was a bulge – some type of object in the right and left cargo pocket. It looked like there was a zipper, and he was trying to – I couldn't tell if he was trying to open the zipper or what he was trying to do. He kept reaching down there, and I told him to keep his hands out of his pocket. At that time he then put his hands in his jacket pocket. At some point I think he went back to his cargo pocket, again, touching it.

Q. Let's go back to the bulge you see in his cargo pants pocket. At that time could you tell what the object was?

A. I could not.

Q. How many times did he reach between his cargo pocket and the other pocket?

A. I would say three or four times.

Q. And, again, how many times did you tell him to not reach his hands into his pockets?

A. Probably three or four times. When he first was going down in his cargo pocket, I told him to keep his hands out of his pocket.

- 5 -

> When he went to his jacket pocket, I told him to keep his hands out of his pocket, and he went back to his cargo pocket.

*Id.* at 40-41.

Appellee continued to ignore Deputy Chief Nych and kept walking. He eventually "got out onto the roadway, and that's where Officer Burnett was at." *Id.* at 42. Deputy Chief Nych saw that Officer Burnett "tried to keep [Appellee] on the sidewalk and continued a conversation with him. He walked around Officer Burnett. I believe Officer Burnett grabbed at him…." *Id.* Officer Burnett did not testify. However, the third officer, Officer Samuel Staples, testified as follows:

> Q. What did you observe as you saw Hermitage police officers making contact with [Appellee]?
>
> A. He was backing up. He was – he was fidgety. He was not willing to engage in any type of conversation, and he was looking to leave the area.
>
> Q. And what did Hermitage police officers do in response to that?
>
> A. We told him he had to talk to us at that point based on what we knew; and he tried to cross the street and enter traffic at that point, and we had to physically stop him from going into traffic.
>
> Q. And which officers had to physically stop him?
>
> A. Corporal Nych, Officer Burnett, and myself.
>
> Q. What efforts did you make to stop this individual?
>
> A. We had to physically put our hands on him and try to bring him to the ground, and we wrestled with him as traffic was going by.

*Id.* at 18.

The law recognizes three types of interactions between citizens and police officers: mere encounters, investigative detentions, and custodial

detentions. "Police may engage in a mere encounter absent any suspicion of criminal activity, and the citizen is not required to stop or to respond." **Commonwealth v. Boswell,** 721 A.2d 336, 340 (Pa. 1998). The Commonwealth repeatedly stresses its view that the initial interaction between Deputy Chief Nych and Appellee was a mere encounter, and that the trial court erred in finding otherwise. The Commonwealth emphasizes that Appellee did not feel compelled to speak to the officers, as he declined to answer their questions and continued walking. To justify the physical takedown, the Commonwealth cites Deputy Chief Nych's testimony that Appellee continued to reach for his pockets despite being told not to, and argues that "the trial court failed to consider the number of times … [Appellee] reached towards and/or into his pockets, and the potential danger to the police officers necessitating a search of … [Appellee]'s person." Commonwealth's Brief at 17.

We disagree. The record and the trial court's factual findings support a conclusion that the officers **attempted** a mere encounter. However, by declining to speak to the officers, a mere encounter did not exist.[2] The officers

---

[2] The repeated questioning itself arguably elevated the encounter into an investigative detention. **See United States v. Wilson,** 953 F.2d 116, 123 (4th Cir. 1991) ("The officer's prolonged and persistent questioning after the suspect had conveyed an unequivocal unwillingness to engage in further conversation with the officer is the type of conduct that is proscribed by the Fourth Amendment."). We decline to affirm on that basis as it is clear the physical interference was an unlawful seizure.

were not authorized to manufacture a potential danger to themselves by continuing to follow Appellee and then detain him on that basis.

There is no doubt that Appellee was seized when the officers physically restrained him, as the Commonwealth concedes. Commonwealth's Brief at 13 ("It wasn't until Deputy Chief Nych and Officer Jason Burnett grabbed … [Appellee]'s arms to restrain him that the investigative detention began."). Simultaneously, the Commonwealth suggests that the officers were entitled, due to the potential threat to their safety, to seize Appellee without subjecting him to an investigative detention. It reasons: "Relevant case law clearly allows the police officers to detain … [Appellee] and search his person without elevating the mere encounter to an investigative detention." *Id.* at 18.

The Commonwealth's contradictory position on whether Appellee was seized is rooted in a line of caselaw involving officers issuing commands during mere encounters. A command to take a specific action is logically irreconcilable with the concept of a mere encounter, as the hallmark of that interaction is the citizen's ability to simply ignore the police. We now discuss two cases relied upon by the Commonwealth that address that seeming conflict: *Commonwealth v. Coleman*, 19 A.3d 1111 (Pa. Super. 2011), and *Commonwealth v. Carter*, 779 A.2d 591 (Pa. Super. 2001).

In *Coleman*, a police officer responded to a radio call reporting a robbery involving two black males wearing green hooded jackets with black coats on top, potentially armed with a knife or gun. The officer proceeded to the reported location and saw Coleman, who fit the description. He

- 8 -

approached Coleman and asked whether Coleman was carrying a weapon. Coleman said no, "but at the same time fumbled with his hands in his pocket." *Coleman*, 19 A.3d at 1114 (quoting trial court opinion). The officer ordered Coleman to put his hands in the air. Coleman failed to comply and, at that point, the officer grabbed Coleman, leading to a physical altercation, an arrest, and discovery of contraband. Coleman argued that he was seized when ordered to show his hands. We disagreed, explaining:

> [T]he fact that Officer Fisher told [Coleman] to take his hands out of his pockets did not turn the encounter into a seizure. This Court has stated that "if during a mere encounter, an individual on his own accord, puts his hands in his pocket, thereby creating a potential danger to the safety of a police officer, the officer may justifiably reach for his side arm and order the individual to stop and take his hand out of his pocket. Such reaction by a police officer does not elevate the mere encounter into an investigative detention because the officer's reaction was necessitated by the individual's conduct." *Commonwealth v. Carter*, 779 A.2d 591, 594 (Pa. Super. 2001); *see also Commonwealth v. Hall*, 713 A.2d 650, 653 (Pa. Super. 1998) (the defendant was not seized when an officer asked him to remove his hands from his pockets; the defendant's refusal to comply escalated the situation into one where the totality of the circumstances justified a stop and frisk), *reversed on other grounds*, … 771 A.2d 1232 ([Pa.] 2001). Thus, [Coleman] was not seized until Officer Fisher grabbed his arm and tried to move him to the police car.

*Coleman*, 19 A.3d at 1116–17. We further concluded that the physical seizure was justified due to the "combination of the description of robber along with [Coleman]'s refusal to remove his hand from his pocket and his 'fumbling' in that pocket…." *Id.* at 1117. *Coleman* thus holds that an individual is not necessarily seized during a mere encounter even if ordered to remove hands.

The **Coleman** Court cited **Carter** to support its holding. There, an officer on patrol approached Carter on the street and asked to speak with him. Carter responded, "What's up?" and during the conversation, put his hand in his pocket at the officer's request. However, the officer then reached for his firearm and ordered Carter to show his hands. Carter complied and removed his hands, holding drugs. The trial court suppressed all evidence, concluding that while the initial conversation was a mere encounter, the officer unlawfully detained Carter by ordering him to show his hands. The Commonwealth appealed, agreeing that the officer's actions escalated the encounter into an investigative detention but argued that reasonable suspicion justified the seizure. We affirmed, concluding that the "critical factor … is the testimony by [the officer] that he initially asked [Carter] to put his hands in his pocket. Since it was the officer who told [Carter] to put his hand in his pocket, we find it absurd that the officer would then argue that he became concerned for his safety when [Carter] complied with his directive." **Carter**, 779 A.2d at 594.

Notably, we declined to accept the Commonwealth's concession that Carter was detained and refused to "establish a rule that whenever an officer reaches for his weapon during an encounter, such encounter automatically escalates into an investigative detention." **Id.** at 593. We opined that the outcome "would have been different if, without being prompted by [the officer], [Carter] put his hand in his pocket. Under this scenario, [the officer] could have reasonably feared for his safety as [Carter] could have been attempting to retrieve a weapon from his pocket." **Id.** at 594.

The Commonwealth's suggestion that, here, the physical seizure was justified due to Appellee's reaching towards his pockets implicates the concept that Appellee "on his own accord … create[ed] a potential danger" to the safety of the officers. *Coleman*, 19 A.3d at 1116. If so, it follows that, as in *Coleman*, Appellee's failure to comply may have supplied a basis for the officer to detain Appellee.

We disagree. First, the *Coleman* Court held that the order to remove hands did not transform the mere encounter into an investigative detention. This analysis would tend to support an argument that Deputy Chief Nych's commands to Appellee to stop reaching for his pockets did not constitute a show of authority that subjected Appellee to an investigatory detention. But *Coleman* is readily distinguishable because Coleman chose to speak to the officers. Thus, the relevant interaction occurred in the context of an actual mere encounter. Appellee, unlike Coleman, declined to speak to the officers. Indeed, whereas our caselaw uses the term "mere encounter," the United States Supreme Court employs the phrase "consensual encounter," making clear that the citizen must consent to the officer's attempt to engage. "What has evolved from our cases is a determination that an initially consensual encounter between a police officer and a citizen can be transformed into a seizure or detention within the meaning of the Fourth Amendment…." *I.N.S. v. Delgado*, 466 U.S. 210, 215 (1984). Because Appellee did not consent to the encounter, there was no "mere encounter" between the officers and Appellee.

- 11 -

As this Court held in **Commonwealth v. Hemingway**, 192 A.3d 126 (Pa. Super. 2018), a case distinguishing **Coleman**, the inquiry is fact specific. **Id.** at 130 ("There is some precedent regarding police requests that defendants remove their hands from their pockets, and the level of encounter resulting from such orders. However, the conclusion we may draw from such precedent is that it is a fact-specific inquiry…."). We conclude that the relevant fact here is Appellee's clear desire not to speak or otherwise interact with the police. As **Carter** stated, "In other words, if **during a mere encounter**, an individual, on his own accord, puts his hand in his pocket, thereby creating a potential danger to the safety of a police officer," further action may be warranted. **Carter**, 779 A.2d at 594 (emphasis added). **Carter** thus anchors the legal analysis to what happened **during** a mere encounter. Because there was never a mere encounter, the Commonwealth's legal analysis proceeds from a flawed premise. **See also United States v. De Castro**, 905 F.3d 676, 681 (3d Cir. 2018) ("It is further instructive to note that many state courts … have likewise determined that an officer's request that a person take their hands out of their pockets is not alone sufficient to convert an **otherwise voluntary encounter** into a seizure.") (emphasis added).

Second, the Commonwealth fails to address the fact that the officers continued to follow Appellee. Recall that in **Carter**, we stated, "A police officer is not permitted to create a dangerous situation and then use the self-created danger as the basis for escalating an encounter into a seizure." **Carter**, 779 A.2d at 594. Again, Appellee had no interest in speaking to the officers and,

thus, the officers needed reasonable suspicion to justify the investigative detention. They were not permitted to create a potential danger to themselves with respect to an officer-safety rationale by following Appellee. As the Commonwealth's memorandum in opposition to Appellee's motion noted, "[Appellee] tried to enter the crosswalk, but Deputy Chief Nych indicated the officers were not done speaking with him." Commonwealth's Memorandum in Opposition, 6/12/23, at 5. An officer cannot unilaterally decide that he or she is "not done" speaking to a person in the context of a mere encounter, force an interaction, and then cite the self-created circumstance as a basis to search. Relatedly, we do not credit the Commonwealth's argument that Deputy Chief Nych's observations of a bulge justified the seizure, as an officer may not detain an individual on that fact alone. *Commonwealth v. Hicks*, 208 A.3d 916, 936–37 (Pa. 2019) ("We find no justification for the notion that a police officer may infer criminal activity merely from an individual's possession of a concealed firearm in public. … [T]here is no way to ascertain an individual's licensing status, or status as a prohibited person, merely by his outward appearance."). Thus, the officers would not have been entitled to seize Appellee even if he had identified the bulge as a firearm.[3]

---

[3] The Commonwealth does not argue that the information known to the officers from the dispatch alone authorized them to detain Appellee. In other words, without the information gained from Appellee's refusal to answer the officers' questions, the Commonwealth concedes that a seizure would have been unwarranted.

- 13 -

For all the foregoing reasons, we do not agree that the trial court erred in granting suppression.

Order affirmed.

Judge King joins this memorandum.

President Judge Emeritus Panella notes his dissent.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

4/11/2024